# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3939

_____

| | | |
|---|---|---|
| In re: Independent Counsel Kenneth W. Starr, | * | |
| | * | |
| | * | |
| Appellee, | * | |
| | * | |
| United States Department of Justice, | * | |
| | * | |
| | * | Appeal from the United States |
| Appellee, | * | District Court for the |
| | * | Eastern District of Arkansas |
| v. | * | |
| | * | |
| Francis T. Mandanici, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:    March 5, 1998

Filed:    June 23, 1998

_____

Before McMILLIAN, BEAM and LOKEN, Circuit Judges.

_____


McMILLIAN, Circuit Judge.

Francis T. Mandanici, an attorney who resides in Connecticut, appeals *pro se* from final orders entered in the United States District Court for the Eastern District of Arkansas, dismissing his "ethics grievance" brought under the color of Rule V(A) of the American Bar Association's Model Federal Rules of Disciplinary Enforcement,[1] In re Starr, 986 F. Supp. 1159 (E.D. Ark. 1997) (Starr II), and denying his motions for recusal. Id., 986 F. Supp. 1157 (E.D. Ark. 1997) (Wright, J.); id., 986 F. Supp. 1159 (E.D. Ark. 1997) (order) (Reasoner, C.J.). For reversal, Mandanici argues that the district court erred or, in the alternative, abused its discretion in refusing to refer his grievance for investigation and the prosecution of a formal disciplinary proceeding under Rule V(A). Mandanici also argues that Chief Judge Reasoner and Judge Wright abused their discretion in refusing to recuse themselves from the adjudication of Mandanici's grievance. For the reasons discussed below, we dismiss this appeal for lack of jurisdiction.

## Background[2]

This case originated from an "ethics grievance" addressed to the District Judges of the United States District Court for the Eastern District of Arkansas in the form of

---

[1]The United States District Court for the Eastern District of Arkansas has adopted the American Bar Association's Model Federal Rules of Disciplinary Enforcement which provide that the district court must apply the code of professional responsibility adopted by the highest court of the state in which the district court sits, which, in this case, is Arkansas. See Local Rules for the Eastern & Western Districts of Arkansas at App.-1, Rule VI(B). The Arkansas Supreme Court has adopted the American Bar Association's Model Rules of Professional Conduct as the State of Arkansas's code of professional responsibility. See In re Arkansas Bar Ass'n, 702 S.W.2d 326, 393 (Ark. 1985).

[2]For a more detailed discussion of the factual and procedural background of this case, see Starr II, 986 F. Supp. 1159, 1164–66 (E.D. Ark. 1997) (Eisele, J., dissenting); id, 986 F. Supp. 1144, 1145–47 (E.D. Ark. 1997) (Starr I).

a letter dated September 11, 1996 (hereinafter "Mandanici I"). In that letter, Mandanici complained to the district court that Independent Counsel Kenneth W. Starr violated (and, presumably, continues to violate) ethical rules concerning conflicts of interest during the course of what is widely known as the Whitewater investigation. Specifically, Mandanici alleged that Starr's substantial ties with the Republican Party create a conflict of interest because the Republican Party has a stake in the outcome of the Whitewater investigation. Mandanici also alleged that Starr has or at one time had a conflict of interest arising out of his investigation of the now-defunct Resolution Trust Corporation (RTC) in connection with Whitewater and a lawsuit that the RTC filed against Starr's law firm.[3] Mandanici alleged that the lawsuit was ultimately settled in secret for $300,000, saving Starr's firm an estimated $700,000.

In light of these allegations, Mandanici requested that the district court refer both matters for investigation and prosecution, pursuant to Rule V(A) of the Model Rules,[4] and sought disciplinary enforcement against Starr in the form of disbarment, suspension, reprimand, or other sanction. The district judges initially voted to refer the

---

[3]Starr is a partner in the Washington, D.C., office of the Chicago-based law firm Kirkland & Ellis.

[4]Rule V(A) provides:

> When misconduct or allegations of misconduct, which if substantiated, would warrant discipline on the part of an attorney admitted to practice before this Court shall come to the attention of a Judge of this Court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these Rules, the Judge shall refer the matter to counsel for investigation and the prosecution of a formal disciplinary proceeding or the formation of such other recommendation as may be appropriate.

Mod. Fed. R. Disc. Enf. V(A).

matter to the Attorney General for review, pursuant to 28 U.S.C. § 596,[5] which confers upon the Attorney General the power to remove an independent counsel.  See id.  The United States Department of Justice (DOJ) responded by letter dated February 7, 1997, which stated, in pertinent part, that the DOJ would take no action against Starr because the "materials that have been presented . . . do not contain allegations of any conduct by [] Starr that can be viewed as so 'extreme' as to call for the Attorney General's use of the extraordinary power of removal."  Joint Appendix (J.A.) at  247 (Letter from Michael E. Shaheen, Jr.[6] to Chief Judge Reasoner of Feb. 7, 1997).  The letter further stated:

> With respect to the allegation of a conflict of interest regarding the RTC, it is true that the materials presented to [the DOJ] on their face indicate that [] Starr at one time may have suffered from at least a technical conflict of interest.  However, those materials also make clear that no such conflict exists at this point.  Consequently, there is no information to support the proposition that such a conflict, if in fact it ever actually existed, substantially impairs [] Starr's current ability to carry out the duties of his office.

Id.

---

[5]Section 596 provides in relevant part:

> An independent counsel . . . may be removed from office, other than by impeachment and conviction, only by the personal action of the Attorney General and only for good cause, physical or mental disability (if not prohibited by law protecting persons from discrimination on the basis of such a disability), . . . or any other condition that substantially impairs the performance of such independent counsel's duties.

28 U.S.C.A. § 596(a) (West Supp. 1997) (footnote omitted).

[6]Counsel with the Office of Professional Responsibility of the DOJ.

After receiving a copy of the DOJ's response, Mandanici reasserted his grievance to the district court in a letter dated March 11, 1997 (hereinafter "Mandanici II"). This time Mandanici focused on the RTC allegations and the added allegation that Starr's then-recent acceptance of a deanship at the School of Public Policy (SPP) at Pepperdine University created a conflict of interest. According to Mandanici, the latter conflict derived from the SPP's substantial endowment from Richard Mellon Scaife, whose criticisms of President Clinton have been widely publicized. Mandanici alleged that Scaife has spent millions of dollars to promote the Whitewater investigation and to press a media campaign to discredit the President.

On August 1, 1997, the district court filed the first of its published opinions in this matter.[7] Starr I, 986 F. Supp. 1144 (E.D. Ark. 1997). The opinion set forth the bases for the recusal of Judges Roy, Woods, Wilson, and Moody.[8] The opinion also contained a lengthy, critical analysis of Mandanici's allegations, authored by Judge Eisele, which different majorities of the court joined in part.[9] Id. at 1145–55. Judge Eisele's analysis was originally printed in the district court's earlier slip opinion, see In re Starr, No. LR-M-97-91 (E.D. Ark. May 30, 1997) (slip op.), and addressed the question of standing, the rules of the court, the court's authority, and the substantive allegations in Mandanici II. His discussion of the allegations was limited, however, to

---

[7]On May 30, 1997, the district court filed a slip opinion ordering briefing on the question of Mandanici's standing. In re Starr, No. LR-M-97-91 (E.D. Ark. May 30, 1997) (slip op.).

[8]Judge Moody recused himself at the outset of the Mandanici II litigation. See Starr I, 986 F. Supp. at 1155. His recusal was confirmed by the district court's August 1, 1997 opinion. Id. at 1144, 1155.

[9]See infra notes 11–12. Chief Judge Reasoner and Judges Howard and Wright dissented from Judge Eisele's analysis and conclusions. Id. at 1155.

the Pepperdine-Scaife issue, and did not address the RTC allegations.[10]

_____

[10]The opinion states: "In light of the Justice Department's response regarding the older RTC allegations, the Court no longer finds any reason to address the RTC allegations." Id. at 1147. The author of this opinion, speaking for himself only, disagrees with this conclusion.

The DOJ analyzed the RTC allegations pursuant to 28 U.S.C. § 596, which imposes the strict standard of "good cause," and determined that there was no basis for removal. Indeed, Congress has made clear that the removal power should not be applied to penalize minor or technical violations of ethical or other duties. See J.A. at 247 (Letter from Michael E. Shaheen, Jr. to Chief Judge Reasoner dated Feb. 7, 1997 (citing S. Rep. No. 496, 97th Cong., 2d Sess. 17 (July 14, 1982), reprinted in 1982 U.S.C.C.A.N. 3537, 3553 ("[W]e stress that the Attorney General should use his [or her] removal power in only extreme, necessary cases . . . .")). Further, the DOJ opined that "apart from the context of removal," the DOJ could not properly "address any allegations that [] Starr has a conflict of interest. An independent counsel is subject to discipline by the Department of Justice only through the statutory removal mechanism." J.A. at 252 (Letter from Michael E. Shaheen, Jr. to Chief Judge Reasoner dated May 21, 1997 (citing 28 U.S.C. § 594(i) (each independent counsel is separate and independent of the DOJ for purposes of enforcing criminal conflict of interest laws))). The DOJ expressly refrained from suggesting whether Mandanici's allegations warranted further review by the district court and informed the court that it "did not gather any additional facts bearing on the issues before [the district] court." Id. at 253.

By contrast, in reviewing allegations of ethical violations of the members of its bar, the district court may consider lesser sanctions that are not subject to the same exacting standards required of the Attorney General for removal under § 596. Thus, while the DOJ's § 596 analysis may guide the district court in conducting its own, independent assessment of Mandanici's allegations, that analysis is of limited applicability and certainly may not supplant that required of the district court. In light of the foregoing, the author of this opinion believes that the district court improperly limited its analysis to the Pepperdine-Scaife issue.

A separate question arises, however, as to whether the district court's referral of the RTC allegations to the Attorney General constitutes effective compliance with Rule V(A) as to the RTC allegations. The Office of Independent Counsel (OIC)

As a preliminary matter, the district court[11] determined that standing was not a "real issue." Id. at 1148. The district court treated Mandanici's grievance as that of a "witness or other third party, even if anonymous, who informed the court of . . . an alleged conflict in counsel's representation." Id. Further, the district court emphasized that Mandanici is not a party to any action pending before the court nor is he a "person with the ability to submit a motion upon which the Court is duty-bound to act." Id.

In its discussion of the merits of the case, the district court rejected a strict, textualist reading of Rule V(A), which provides in pertinent part:

> When misconduct or allegations of misconduct, which if substantiated, would warrant discipline on the part of an attorney admitted to practice before this Court shall come to the attention of a Judge of this Court . . . the Judge *shall* refer the matter to counsel for investigation and the prosecution of a formal disciplinary proceeding or the formation of such other recommendation as may be appropriate.

Mod. Fed. R. Disc. Enf. V(A) (emphasis added). The district court held that, despite its use of the word "shall," Rule V(A)'s language is precatory in nature and does not give rise to an obligation on the part of the district court to refer such complaints for

---

candidly submits that the main purpose of the district court's referral was to determine whether the threshold requirements of Rules V(A) were met; that is, the district court sought to determine whether the alleged conduct, if substantiated, could be subject to disciplinary action. However, as this court does not ultimately reach the merits of Mandanici's allegations, it will refrain from deciding this issue.

[11]Judges Eisele, Roy, Woods, and Wilson. Chief Judge Reasoner and Judges Howard and Wright opined that Mandanici lacked standing to submit his ethics grievance to the court because "Mandanici is an interloper out to manipulate the Court for his political purposes and . . . his efforts constitute a political vendetta." Starr I, 986 F. Supp. at 1148. In addition, they point out that Mandanici has no personal interest in the matters that Starr is investigating as Independent Counsel. Id.

-7-

investigation and prosecution.[12] Id. at 1149. In light of this determination and their

[12]The district court reasoned that it should "be able to adapt [local rules] to unforeseen circumstances," and that inflexibility in reading Rule V(A) could lead to "unreasonable, unfair, and unwise results when viewed in light of the overall purposes" of the disciplinary rules. Starr I, 986 F. Supp. at 1149. The district court further stated that reading a mandatory referral into Rule V(A) would be inconsistent with the district court's practice since it adopted the Model Rules over 20 years ago. See id.

In dissent, Judges Roy, Wilson, and Woods asserted that Rule V(A) creates a mandatory duty to refer Mandanici's allegations for investigation. See id. The author of this opinion, speaking for himself only, agrees with the interpretation of the dissenting judges.

"[T]he words of a rule are intended to communicate a meaning to those to whom they are addressed, rather than to carry some gloss, hidden in the minds of the judges who drafted the rule." 12 Charles A. Wright et al., Federal Practice and Procedure § 3153 (2d ed. 1997). The word "shall" has consistently been held to create an imperative or command. See, e.g., Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, — U.S. —, —, 118 S. Ct. 956, 962 (1998) (Lexecon) (observing that, as a statutory term, "'shall' . . . normally creates an obligation impervious to judicial discretion") (citing Anderson v. Yungkau, 329 U.S. 482, 485 (1947)); Stanfield v. Swenson, 381 F.2d 755, 757 (8th Cir. 1967) ("When used in the statutes the word 'shall' is generally regarded as an imperative or mandatory and therefore one which must be given a compulsory meaning."). Where, as here, the meaning of the rule is clear from its language, no further inquiry is required. Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992) ("[C]ourts must give effect to the clear meaning of statutes as written."); United States v. Morales, 108 F.3d 1031, 1036 (9th Cir. 1997) ("If the meaning of the rule is perfectly plain from its language, that ends the inquiry.")). Rule V(A) thus plainly requires the district court to refer allegations of misconduct to counsel for investigation and prosecution.

This conclusion is not inconsistent with the rule of this and other courts that district courts should be accorded great deference in interpreting their own rules. Indeed, other appellate courts have noted that a district court's inherent power to discipline attorneys who practice before it does not absolve the court from its obligation to follow the rules it created to implement its exercise of such power. Matter of

respective friendships with the President and Mrs. Clinton, Judges Roy, Woods, and Wilson recused themselves.[13]  Id. at 1156.

In a subsequent opinion granting a motion by the OIC to dismiss Mandanici's complaints, Judge Wright, writing for the majority,[14] determined that Mandanici's allegations did not warrant referral for investigation and prosecution.  Starr II, 986 F. Supp. at 1168.  In reaching this conclusion, the district court specifically relied on the following factors: (1) Mandanici's complaint represented "a personal crusade to discredit the Independent Counsel"; (2) there was no specific evidence of misconduct by Starr in the course of the proceedings before the district court; and (3) after reviewing Mandanici's allegations, the DOJ determined that there was no basis for

_____

Thalheim, 853 F.2d 383, 388 (5th Cir. 1988); Matter of Abrams, 521 F.2d 1094, 1104 (3d Cir. 1975); cf. Congregation of the Passion v. Touche, Ross & Co., 854 F.2d 219, 223 (7th Cir. 1988) (noting that, despite considerable discretion given to district courts in interpreting their local rules, courts of appeal will reverse a district court's construction of its own rule whenever the district court has clearly misconstrued the rule); 12 Federal Practice and Procedure § 3153 (same).  Moreover, the Supreme Court has held that the plain command of a statute should be given effect "even if doing that will reverse the longstanding practice under the statute and the rule."  Lexecon, — U.S. at —, 118 S. Ct. at 962 (citation omitted); see also Brown v. Gardner, 513 U.S. 115, 122 (1994) ("Age is no antidote to clear inconsistency with a statute.").

[13]Judge Wilson notably wrote of their recusal:

Those of us who are recusing do not do so lightly.  We do this realizing that this probably has the effect of killing the Mandanici II complaint without it having been considered on the merits.  In fact, it is hard to escape the conclusion that our recusal may well confer de facto immunity on the Independent Counsel, with respect to ethical violation complaints.

Starr I, 986 F. Supp. at 1157.

[14]Chief Judge Reasoner and Judges Howard and Wright.

action by that office.[15]  Id. at 1161.

---

[15]The author of this opinion, speaking for himself only, takes issue with the weight that the district court accorded to both the DOJ's letter and Mandanici's alleged personal or political animus in filing the underlying complaints, the district court's assumption that specific evidence of misconduct is required under Rule V(A), and the district court's failure to analyze the substance of Mandanici's allegations.  Judge Eisele addressed these issues in an insightful opinion concurring in part and dissenting in part from the district court's majority opinion.  The author of this opinion agrees with Judge Eisele's analysis.

Judge Eisele argued that Mandanici's allegations, if true, demonstrate that Starr suffered under at least an appearance of conflict with respect to the Pepperdine-Scaife issue, thereby triggering the district court's duty to refer the matter for investigation under Rule V(A).  See Starr II, 986 F. Supp. at 1166, 1168 (Eisele, J., dissenting) ("It is my opinion that the Court has not only the legal authority but also the institutional duty to inquire into the Pepperdine-Scaife issue.").  Specifically, Judge Eisele noted that, in refusing to address the substance of Mandanici's allegations, the majority incorrectly assumed that specific evidence of misconduct was required to establish an appearance of conflict.  Id. at 1166–67.  The majority wrote:

[T]his court is unaware that [] Starr has ever acted in an improper or unethical manner in the matters over which this Court has presided, and in the absence of specific evidence of misconduct on the part of the Independent Counsel in proceedings before this Court, and considering the motivations behind [] Mandanici's allegations, this Court declines the opportunity to provide [] Mandanici a forum for the pursuit of his "vendetta."

Id. at 1162.  However, it is axiomatic that specific evidence of actual misconduct is not required to demonstrate that there is an appearance thereof.

Judge Eisele also challenged the majority's emphasis on Mandanici's "vendetta" against Starr and asserts that these concerns should have been put aside in favor of an objective analysis of the merits of Mandanici's allegations.  See id. at 1167.  Finally, Judge Eisele criticized the majority's reliance upon the DOJ's investigation as strong support for its conclusion that Mandanici's allegations do not warrant referral.  See id.

As the majority acknowledged, the DOJ expressly stated that it takes "no position on whether the Court should exercise its discretionary authority to review [the Mandanici allegations] or to take any action if it does so," J.A. at 198 (Response by the Attorney General to Motion to Dismiss at 16), and that its decision not to investigate the Pepperdine-Scaife allegation was based on "the high threshold for triggering an investigation where the issue is the use of the Attorney General's removal power under 28 U.S.C. § 596(a)(1)." Id. at 261 (Letter from Michael Shaheen, Jr. to Judge Eisele of Aug. 8, 1997). Judge Eisele contended that, because the DOJ employed a "very high threshold" for purposes of removal, the DOJ's analysis is of limited applicability to the majority's determination whether to impose lesser sanctions, particularly where the majority did not address the allegations (and supporting evidence) regarding Starr's apparent conflict of interest. Starr II, 986 F. Supp. at 1167.

Contrary to Judge Loken's concurrence, neither Judge Eisele nor the author asserts that the Pepperdine-Scaife issue amounts to "an *apparent political* conflict of interest." Infra, at 22, (concurring in judgment) (emphasis in original). Indeed, Judge Eisele clearly stated: "The alleged Pepperdine-Scaife conflict that I have identified has nothing whatsoever to do with Mr. Starr's political views. Rather, it puts Mr. Starr's personal, financial, and career interests in possible conflict with his duty as independent counsel to exercise his prosecutorial power and discretion fairly and even-handedly." Starr II, 986 F. Supp. at 1167 (Eisele, J., dissenting). Likewise, the author opines that, if true, the Pepperdine-Scaife allegations create the appearance of a personal conflict of interest as defined in 28 C.F.R. § 45.2(b)(2) (1998) (defining "personal relationship" as "a close and substantial connection of the type normally viewed as likely to induce partiality"). Moreover, there is nothing in the express language of the Independent Counsel Act, 28 U.S.C. § 594, or 28 U.S.C. § 528 (providing for the disqualification of officers and employees of the DOJ in the event of an actual or apparent personal, financial, or political conflict of interest), that would prohibit the district court from enforcing the ethical standards contained in its local rules against federal prosecutors, including independent counsel, qua members of the bar. See also J.A. at 189 (Response by the Attorney General to Motion to Dismiss at 7) ("[W]e are not aware of any evidence that Congress meant in the Ethics in Government Act, or any other statute, to interfere with [the district court's] traditional power . . . to supervise the ethical conduct of attorneys, including those representing the United States, appearing before it."); cf. Whitehouse v. United States District Court, 53 F.3d 1349, 1357 (1st Cir. 1995) (recognizing district court's authority to regulate prosecutorial

-11-

By separate orders dated October 2, 1997, Chief Judge Reasoner and Judge Wright denied motions by Mandanici seeking their recusal in light of an alleged "appearance of impartiality" arising in part from Judge Wilson's comment that "the district judges of the eastern District who were foes of the Clintons during their Arkansas days are not recusing . . . ."  See Starr II, 986 F. Supp. at 1157.

Mandanici appeals from the portion of the district court order dated October 2, 1997, dismissing Mandanici II.[16]  In addition, Mandanici appeals from the separate orders of Chief Judge Reasoner and Judge Wright declining to recuse themselves.

### Discussion

As stated above, the primary issue on appeal is whether Mandanici has standing.  If Mandanici does not have standing, then this court does not have jurisdiction to

---

conduct); United States v. Klubock, 832 F.2d 664 (1st Cir. 1987) (en banc) (upholding constitutionality of local rule regulating prosecutorial conduct); United States v. Johnston, 690 F.2d 638 (7th Cir. 1982) (applying attorney-witness conflicts rule to federal prosecutors); United States v. Splain, 545 F.2d 1131, 1135 (8th Cir. 1976) (noting that prosecutor's unprofessional conduct may subject him or her to disciplinary sanctions).  More important, however, is the district court's failure to engage in the manner of analysis that Judge Loken sets forth, infra, at 23-25, to determine whether the appearance of a conflict (personal or otherwise) exists under federal conflict-of-interest laws.  As noted above, it is this abandonment by the district court of its obligation to analyze the merits of Mandanici's allegations pursuant to Rule V(A) with which the author finds fault.

[16]On June 19, 1997, Mandanici filed a third grievance alleging additional ethical violations by Starr concerning grand jury leaks and prejudicial comments to the press (hereinafter "Mandanici III").  The district court dismissed this grievance in its order dated October 2, 1997.  See Starr II, 986 F. Supp. at 1161–62.  Mandanici does not appeal the district court's dismissal of the allegations set forth in Mandanici III.

decide any other issues raised on appeal.  Steel Co. v. Citizens for a Better Env't,  — U.S. —, —, 118 S. Ct. 1003, 1012 (1998) ("'Without jurisdiction the court cannot proceed at all in any cause.'") (rejecting doctrine of "hypothetical jurisdiction") (quoting Ex parte McCardle, 74 U.S (7 Wall.) 506, 514 (1868)).  However, before examining this court's jurisdiction, we are obligated to determine whether jurisdiction was proper in the district court, especially because it is not readily apparent nor was it determined conclusively by the district court.[17]  See, e.g., Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it.") (quoting Mitchell v. Maurer, 293 U.S. 237, 244 (1934)).

There is long-standing precedent in this circuit that informants of ethics grievances lack standing to commence a formal action, and thus have no standing to bring an appeal in such matters.  This court visited the issues of standing and  jurisdiction in a case analogous to the one at bar over thirty years ago in Mattice v. Meyer, 353 F.2d 316 (8th Cir. 1965) (Mattice), where we held that  private citizens not only lack standing at law to maintain a disciplinary proceeding as a formal action in the district court, but they also lack standing on appeal.[18]  Id. at 319.

In Mattice, a private citizen, joined by other plaintiffs, filed a complaint to have the Attorney General of Nebraska disbarred on account of an alleged ethical violation.

---

[17]The district court wrote:  "For purposes of addressing [] Mandanici's allegations, the Court will assume that it has jurisdiction over ethics claims involving the Independent Counsel and that [] Mandanici has standing under our Model Rules to pursue his claim."  Starr II, 986 F. Supp. at 1160 (footnote omitted).

[18]In light of the serious nature of the underlying allegations in Mattice, this court went further to determine whether they had any factual support and found none.  See Mattice v. Meyer, 353 F.2d 316, 319 (8th Cir. 1965).

In dismissing the appeal from the district court's refusal to act, this court adopted the Third Circuit's analysis in Ginsburg v. Stern, 125 F. Supp. 596 (W.D. Pa. 1954), aff'd, 225 F.2d 245 (3d Cir. 1955) (Ginsburg):

> Plaintiff's petition, just as any other complaint of professional misconduct, merely supplied information for the court's consideration. It is ridiculous to assert that the court has no alternative but to take action against the person complained of. If the court considers that no offense has been committed; or that the allegations of the complaint are insufficient, immaterial, impertinent or scandalous; or that the complaint has been filed from an improper motive; or for any other reason decides not to proceed with the matter, the complainant has no recourse.

Mattice, 353 F.2d at 319 (quoting Ginsburg, 125 F. Supp. at 603). We further observed that

> [a]n individual may, acting as an informer, make available to the district court pertinent information bearing upon the qualifications or professional conduct of a member of the federal bar. Beyond that point the individual may not exercise control over the proceedings of the court. Further action, if any, becomes the responsibility of the court.

Id.[19] Thus, as the OIC contends, Mattice clearly establishes that Mandanici's role

_____

[19]This court's reasoning in Mattice has been cited with approval in a variety of actions in which an individual has sought suspension or other disciplinary action against an attorney. See Ramos Colon v. United States Attorney for the Dist. of P.R., 576 F.2d 1, 6, 9 (1st Cir. 1978) ("A private party cannot challenge the court's decision not to discipline. . . . It remains for the court to vindicate its authority, if it so chooses."); Action of Phillips, 510 F.2d 126, 127 (2d Cir. 1975) (per curiam) ("[A] private person or a lawyer has no standing to participate in a disciplinary proceeding."); see also In re Echeles, 430 F.2d 347, 350 (7th Cir. 1970) (holding that United States had no standing to appeal the result of a disbarment proceeding where nothing in record indicated that it had an interest in the matter or was a party to the underlying suit); In re Teitelbaum, 253 F.2d 1, 2 (7th Cir. 1958) (holding that a complainant has no standing "as a party or otherwise" to appeal).

begins and ends with the filing of his ethics grievance. More important, Mandanici "lacked standing at law to maintain the proceeding as a formal action; absent the pendency of an action," Mandanici has no standing to appeal. Id.

Mandanici attempts to distinguish Mattice by arguing that Rule V(A) and 28 U.S.C. § 1291, which he contends confer jurisdiction, were adopted well after Mattice was decided. However, the plain language of these provisions shows that they, along with Rule 8.3 of the Arkansas Rules of Professional Conduct,[20] confer nothing more than standing to complain or inform the court of alleged misconduct; none of these provisions, by their terms or scope, confers standing to commence a case. Thus, Mandanici could bring his grievance before the district court as an informant only. Absent an action in the district court, he cannot appeal. Accordingly, there is no basis for this court's jurisdiction on appeal.

Indeed, Mandanici acknowledged during oral argument that, on appeal, the standing issue is the death knell of his ethics grievance, save one finding by this court–that he and every other citizen of the United States have standing to pursue the underlying grievance because of the "vital interest" that derives from the "uniqueness" of this case and the proceedings that form its backdrop.[21] Implicit in this argument,

---

[20]Rule 8.3 requires that "[a] lawyer having knowledge that another lawyer has committed a violation of the rules . . . that raises a . . . question as to that lawyer's honesty . . . inform the appropriate professional authority." Ark. R. Prof. Cond. 8.3.

[21]Mandanici finds support for his argument in Judge Eisele's statement that "the Pepperdine allegations suggest the type of conflict that is not waivable in that they concern not a particular conflicted client but the integrity of prosecutorial decisionmaking in which *every inhabitant of this land has a vital interest.*" See Starr I, 986 F. Supp. at 1153 (emphasis added).

however, is the additional concession that Mandanici's interest in pursuing this case is no greater than any other citizen's. Mandanici nonetheless presses his claim that this case is so unique and the interest so vital that standing is automatically conferred upon every citizen.

We conclude that, although the Whitewater investigation and the propriety thereof are undoubtedly of national import, the constitutional and prudential principles of standing compel us to reject the kind of citizen standing that Mandanici seeks to establish. In order to satisfy Article III's standing requirements, Mandanici must have (1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct and (3) likely to be redressed by the proposed remedy. See, e.g., Steel Co. v. Citizens for a Better Env't, — U.S. at —, 118 S. Ct. at 1016-17 (citations omitted). The injury must be "concrete and particularized," not "conjectural" or "hypothetical," and "must affect the plaintiff in a personal and individual way." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 & n.1 (1992); see also Gladstone v. Village of Bellwood, 441 U.S. 91, 100 (1979) (Gladstone) ("[A] litigant normally must assert an injury that is peculiar to himself [or herself] or to a distinct group of which he [or she] is a part . . . ."). In other words, the injury must be beyond that "'shared in substantially equal measure by all or a large class of citizens.'" See, e.g., Gladstone, 441 U.S. at 100 (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975) (Warth)); cf. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 482-83 (1982) (Valley Forge) ("This court has rejected claims of standing predicated on 'the right possessed by every citizen, to require that the Government be administered according to law . . . .'") (internal quotation omitted).

The prudential principles of standing ensure that federal courts are not "called upon to decide questions of broad social import in cases in which no individual rights will be vindicated, and [that] access to the federal courts [is] limited to those litigants best suited to assert the claims." Gladstone, 441 U.S. at 99-100. Among the prudential concerns is the doctrine that "a litigant's grievance must arguably fall within the zone

of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bennett v. Spear, — U.S. —, —, 117 S. Ct. 1154, 1161 (1997) (Bennett) (citations omitted). See generally Association of Data Processing Serv. Org., Inc. v. Camp, 397 U.S. 150 (1970). "[T]he breadth of the zone of interests varies according to the provisions of law at issue . . . ." Bennett, — U.S. at —, 117 S. Ct. at 1161. Thus, in order for Mandanici to demonstrate that he satisfies prudential principles of standing, the provisions of Rule V(A) must afford a right of suit to those who inform the court of the alleged misconduct proscribed by the statute.

Mandanici has failed to demonstrate that he meets the constitutional and prudential requirements of standing. First, he has not articulated what injury he has in fact suffered; instead he asserts that the "uniqueness" of the case confers standing (and thus, jurisdiction) absent any constitutional basis.[22] However, the uniqueness of a case or the vitalness of an alleged interest has never been proved a proxy for the "constitutional minima" of Article III standing and, in any event, does not absolve this court of its duty to determine jurisdiction based on constitutional and prudential principles. In our attempt to fulfill that duty, we cannot discern any injury that is fairly traceable to the conduct of Independent Counsel Kenneth Starr and is distinct and personal to Mandanici or a class of litigants of which he is a part. Indeed, Mandanici cannot allege to have suffered an injury that is any greater than that which might have been suffered by other concerned citizens. Under such circumstances, "[t]he federal

---

[22]The only cases that Mandanici cites for the proposition that he has standing are state cases, which not only do not bind this court, but also do not support Mandanici's theory of "citizen standing." See Brief for Appellant at 25-26. Rather, these cases and the treatises and professional rules that Mandanici cites on this issue merely acknowledge the vital role that citizens and third parties play in disciplinary proceedings by filing complaints and the standing of those persons to bring forth a such complaints. Id. (citing Ark. R. Prof. Cond. 8.1 ("[A] disciplinary proceeding may be initiated by [bar] counsel upon complaint of another person or entity."), 8.3). These sources do not decide whether a plaintiff has standing in federal court to compel disciplinary proceedings or referral for investigation and prosecution.

courts have abjured appeals to their authority which would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" Valley Forge, 454 U.S. at 473 (quoting United States v. SCRAP, 412 U.S. 669, 687 (1973)). In light of the foregoing, we hold that Mandanici cannot establish a sufficient injury in fact to satisfy the Article III standing requirements.

Assuming, *arguendo*, that the Article III requirements of standing were fulfilled, this court still lacks jurisdiction because Mandanici cannot satisfy the judicially-imposed prudential standing principles. See Warth, 422 U.S. at 498 (holding that standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise") (citing Barrows v. Jackson, 346 U.S. 249 (1953)). Nothing in the language of Rule V(A) supports the view that the individual or collective concerns of persons such as Mandanici fall within the zone of interests protected by the rule. In short, Rule V(A) does not create a cause of action for informants; rather, Rule V(A) merely guides the district court in the exercise of its inherent right and obligation to oversee the integrity of the court by disciplining the bar. Moreover, Mandanici is not a party to any proceeding involving Starr, the Whitewater investigation, or the OIC, other than the instant case. As the district court determined earlier, Mandanici is a mere "informer," a supplier of information to whom the district court owes no discrete obligation. "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules," id. at 501; however, it has not done so in this context. Accordingly, Mandanici has no standing to bring this appeal.

Finally, we feel obliged to explore two other possible grounds for appellate jurisdiction, each of which fails for different reasons. First, it is well-established that courts of appeal may exercise supervisory authority over lower courts. See, e.g., La Buy v. Howes Leather Co., 352 U.S. 249, 259-260 (1957). Such authority is typically exercised in the context of criminal proceedings, but has been extended on occasion to monitor the adjudication of civil and quasi-criminal matters. See, e.g., In re Globe Newspaper Co., 920 F.2d 88 (1st Cir. 1990) (Globe); In re Furlong, 885 F.2d 815, 819

(11th Cir. 1989); In re Snyder, 770 F.2d 743 (8th Cir. 1985). These extensions notwithstanding, this court has circumscribed its exercise of supervisory authority to the "judicial activities" of the district courts. In re Pickett, 842 F.2d 993, 995 (8th Cir. 1988). Although the underlying allegations may give rise to disciplinary proceedings which constitute judicial activity, we believe that our supervisory authority is further circumscribed by Mandanici's lack of a personal interest in this litigation.

Indeed, this case is distinguishable from Globe, where the First Circuit took jurisdiction under the All Writs Act to review a district court's decision to deny public access to the names and addresses of jurors in a prior criminal trial. 920 F.2d at 90. There the court held that the interest of news gathering and the privacy rights of jurors were an appropriate matter for consideration under the court's supervisory powers. Id. at 90. More important, the court noted that denying access to this information "affects news gathering" and implicates important constitutional and common law rights. Id. at 90, 94–96. The court also interpreted § 10(c) of the District of Massachusetts Plan for Random Selection of jurors as making this information available subject to certain judicial findings that were not made by the district court. However, unlike the petitioner in Globe, Mandanici has no right, by statute or common law, that is implicated by the district court's failure to make a referral under RuleV(A). As noted above, Mandanici cannot demonstrate any injury peculiar to him or to a class of citizens of which he is a part. For these reasons, this court is reluctant to exercise its supervisory authority over the district court in this context.

Second, Rule 46(b) of the Federal Rules of Appellate Procedure provides in pertinent part: "When it is shown to the court that any member of its bar has been . . . guilty of conduct unbecoming a member of the bar of the court, the member will be subject to suspension or disbarment by the court." Fed. R. App. P. 46(b). Independent Counsel Kenneth Starr was admitted to the bar of this court on May 9, 1995, and thus, like any other attorney of this court, is subject to this rule. However, as should be obvious from its similarity to Rule V(A), Rule 46 fails to confer standing upon

-19-

Mandanici (and thus, jurisdiction upon this court) for the same reasons that Rule V(A) fails to do so–neither rule elevates Mandanici's status above that of an informant.

## Conclusion

In sum, Mandanici has no standing to pursue his grievance in the district courts of this circuit beyond informing those courts of alleged misconduct, and no standing to appeal.  Accordingly, we dismiss this appeal for lack of jurisdiction.[23]


BEAM, Circuit Judge, with whom LOKEN, Circuit Judge, joins, concurring in part.

I concur in the result reached by Judge McMillian.  I agree with those portions of his opinion holding that Mr. Mandanici has insufficient Article III standing to file either an initial action or an appeal seeking the imposition of lawyer discipline by the district court or by this court and with those portions holding that we do not have jurisdiction to reach the merits, if any, of Mr. Mandanici's allegations.  However, I would go no further.

I first note that it is not entirely clear from the record how the district court treated the letter-complaints filed by Mr. Mandanici.  If the letters were simply treated as disciplinary grievances, then the district court had inherent power to consider the substantive allegations contained therein.  See Mattice v. Meyer, 353 F.2d 316, 319 (8th Cir. 1965).  Otherwise, if they were treated as complaints filed by Mr. Mandanici as a party to the action, the district court had no jurisdiction to consider the merits.

Although it is fundamental that every court has inherent authority to disbar or

---

[23]All substantive issues raised by Mandanici on appeal, including the denial of his motions to recuse, are moot in light of our jurisdictional disposition.

-20-

discipline attorneys for unprofessional conduct, that is not the nature of this matter as presented in this court.  See id.  As noted by Judge McMillian, for more than thirty years this circuit has maintained that an individual such as Mr. Mandanici lacks standing to "institute and maintain" an action or an appeal seeking discipline against or disbarment of a lawyer.  Id. at 318; accord In re Continental Steel Corp., 966 F.2d 1456 (7th Cir. 1992) (unpublished table decision) (embracing Mattice specifically).  A person who files an ethics grievance concerning a particular attorney does nothing more than "suppl[y] information for the court's consideration."  Mattice, 353 F.2d at 319 (citation omitted). He does not thereby "initiate an action."  Id.  If the district court "decides not to proceed with the matter, the complainant has no recourse."  Id. (citation omitted).  Therefore, Mr. Mandanici's current effort before this court must be construed as an attempt to invoke our Article III jurisdiction to seek review of an unappealable event.

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies,'"  and "[a]s an incident to the elaboration of this bedrock requirement, [the Supreme Court] has always required that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit."  Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982).  The federal courts must consider their own jurisdiction, "and standing 'is perhaps the most important of [the jurisdictional] doctrines.'"  United States v. Hays, 515 U.S. 737, 742 (1995) (quoting FW/PBS, Inc. v. Dallas, 493 U.S. 215, 230-31 (1990)) (alteration in original).  Thus, in this appeal, the first and fundamental question is that of jurisdiction, both in this court and in the court from which the record comes.  See Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1012 (1998).  This requirement is a threshold matter that "'spring[s] from the nature and limits'" of the federal judicial power and is "'inflexible and without exception.'"  Id. (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)) (alteration in original). When this first question is answered, it is clear that Mr. Mandanici lacks standing directly to assert his various disciplinary complaints, see Opinion of McMillian at 17, and, as a result, this court does not have the jurisdiction or the power to consider them

in any manner whatsoever.  See Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990).

Without jurisdiction, which is clearly absent here, this court "'cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases [or fails to exist in the first instance], the only function remaining to the court is that of announcing the fact and dismissing the cause.'"  Steel Co., 118 S. Ct. at 1012 (quoting Ex parte McCardle, 7 Wall. 506, 514 (1868)).  Accordingly, our proper course of action is to announce our complete lack of jurisdiction and to dismiss this case.

LOKEN, Circuit Judge, with whom BEAM, Circuit Judge, joins, concurring:

I agree with Judge Beam that we should simply dismiss this appeal for lack of jurisdiction because Mr. Mandanici lacks standing to appeal.  Judge McMillian has concluded that some discussion of the merits is in order.  He then goes on to propose that whenever an independent counsel is conducting grand jury proceedings, the district court must investigate any charge that the independent counsel is tainted by an *apparent political* conflict of interest.  With all due respect, I believe this startling proposition is sufficiently misguided -- both legally and historically -- to require a response.

Judge McMillian cites no federal authority for his proposed rule.  In fact, it is contrary to the Independent Counsel Act *and* the statutes and regulations governing other federal prosecutors.  Initially, the Independent Counsel Act had no provisions regulating independent counsel conflicts of interest.  In 1987, the Department of Justice announced that independent counsel were subject to federal conflict-of-interest laws as Department employees.  Congress, rebelling at what some viewed as "a back-door assault on the independent counsel law,"[24] amended the statute in 1988.  First, Congress

---

[24] Beth Nolan, Removing Conflicts from the Administration of Justice: Conflicts of Interest and Independent Counsels under the Ethics in Government Act, 79 Geo. L.J. 1, 29 (1990).

added 28 U.S.C. § 594(i), which declares independent counsel separate from the Department of Justice for these purposes. Of greater significance here, Congress added 28 U.S.C. § 594(j), which contains specific "standards of conduct applicable to independent counsel." This statute places specific conflict-of-interest restrictions on permissible outside employment for a private attorney while serving as independent counsel, and on the clients that a former independent counsel may represent for one to three years after his or her duties as independent counsel terminate. Congress did not in this statute place any limitations on an independent counsel's political activities. It appears that Mr. Mandanici has never accused Independent Counsel Starr of even an arguable violation of this controlling statute.

Although independent counsel are not Department of Justice employees, they are directed, "except to the extent that to do so would be inconsistent with the purposes of this chapter, [to] comply with the written or other established policies of the Department of Justice respecting enforcement of the criminal laws." 28 U.S.C. § 594(f).[25] Thus, in looking at the question of an independent counsel's political conflicts of interest, any standards governing other federal prosecutors are relevant, particularly because the federal statute addressing this subject, 28 U.S.C. § 528, was enacted as part of the Ethics in Government Act, the statute that first authorized the appointment of independent counsels. Section 528 directs the Attorney General to:

> promulgate rules and regulations which require the disqualification of any officer or employee of the Department of Justice, including a United States attorney . . . from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict

---

[25]Independent counsel are also "special Government employees" for purposes of the federal crimes relating to bribery, graft, and conflicts of interest. See 18 U.S.C. § 202(a). There has been no allegation that Independent Counsel Starr has violated any of those criminal statutes.

of interest, or the appearance thereof.

In response, the Attorney General promulgated 28 C.F.R. § 45.2 (formerly 28 C.F.R. § 45.735-4), which provides in relevant part:

     (a) Unless authorized under paragraph (b) of this section, no employee shall participate in a criminal investigation or prosecution if he has a personal or political relationship with:

     (1) Any person or organization substantially involved in the conduct that is the subject of the investigation or prosecution; or

     (2) Any person or organization which he knows has a specific and substantial interest that would be directly affected by the outcome of the investigation or prosecution.

         \*    \*    \*    \*    \*

     (c) For the purposes of this section:

     (1) *Political relationship* means a close identification with an elected official, a candidate (whether or not successful) for elective, public office, a political party, or a campaign organization, arising from service as a principal adviser thereto or a principal official thereof.

This is a narrow definition of a disqualifying political conflict of interest. By no stretch of the imagination does Independent Counsel Starr have a "political relationship" with Pepperdine University or publisher Scaife within the meaning of § 528(c)(1). And it is nearly as preposterous to speculate that Pepperdine or even Scaife has a "specific and substantial interest" that would be "directly affected" by Mr. Starr's grand jury investigations. Thus, the rule proposed by Judge McMillian finds no support in the most pertinent federal statutes and regulations.

Looking at the question more broadly, it is not surprising that federal law does not restrict or disqualify prosecutors on the basis of vaguely defined political conflicts of interest. Judge McMillian's proposal seems premised on the notion that prosecutors should be subject to the same conflict-of-interest standards as judges. But that ignores the very different public functions these officeholders perform. As the Supreme Court explained in Marshall v. Jerrico, Inc., 446 U.S. 238, 248-50 (1980):

> Prosecutors need not be entirely "neutral and detached." In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law. . . . Prosecutors are also public officials; they too must serve the public interest. . . . [T]raditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law. . . . But the strict requirements of neutrality cannot be the same for . . . prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime.

(Citations omitted.) For these reasons, prosecutor disqualification cases have primarily focused on issues specifically addressed in 28 U.S.C. § 594(j) -- whether the prosecutor, or a private party who is a client of the prosecutor, has a direct personal or financial interest in the criminal proceeding at issue. Cf. Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 805-08 (1987).

As even a brief look at history will confirm, judicial reluctance to question a prosecutor's political background or views is even more important in the type of criminal proceeding at issue in this case, the investigation of corruption and other misconduct by high-ranking government officials. The Independent Counsel Act reflects congressional recognition that effective investigation of on-going misconduct requires prosecutors who "enjoy some measure of independence from the Executive Branch." In Re Olson, 818 F.2d 34, 42 (D.C. Cir. 1987). The impetus for aggressive

investigations has usually come from an officeholder's political opposition.[26]  Therefore, it is not surprising that some of our most well-known and successful corruption fighters have been investigators and prosecutors who brought to the task highly partisan backgrounds and strong personal political ambitions.

For example, a congressional investigation into the Gold Panic scandal during the Grant Administration was led by Republican James A. Garfield, later President of the United States.  In the 1920's, after being forced by a special act of Congress to investigate the Teapot Dome scandal, President Coolidge chose as investigators Democratic Senator Atlee Pomerene, then running for reelection,[27] and Republican attorney Owen Roberts, who later became an Associate Justice of the Supreme Court.  In the early 1930's, New York City's Tammany Hall machine was broken by the relentless investigations of Judge Samuel Seabury, a long-time Democratic political activist who blamed the Tammany machine for his unsuccessful campaign for Governor

---

[26]Independent counsel before and after Mr. Starr have usually been chosen from the opposing political party.  The first independent counsel, Archibald Cox, had been Solicitor General in the Johnson Administration.  The Honorable J. Harvie Wilkinson & The Honorable T.S. Ellis, The Independent Counsel Process: Is It Broken and How Should It Be Fixed?, 54 Wash. & Lee Rev. 1515, 1539 (1997).  Republican Arthur Christy investigated President Carter's Chief of Staff, Hamilton Jordan.  Constance O'Keefe & Peter Safirstein, Fallen Angels, Separation of Powers, and the Saturday Night Massacre: An Examination of the Practical, Constitutional, and Political Tensions in the Special Prosecutor Provisions of the Ethics in Government Act, 49 Brook. L. Rev. 113, 124 n. 51 (1982).  The Clinton Administration appointed Republican Robert Fiske to investigate the death of Vincent Foster.  Gerard E. Lynch & Philip K. Howard, Special Prosecutors: What's the Point?, Washington Post, May 28, 1995, at C7.

[27]It was believed that Pomerene's "prominence as co-counsel in the [case] would help him" in the election, but ironically he was defeated by a Harding Administration friend and defender.  M.R. Werner & John Starr, Teapot Dome 211 n.1 (1973).  Pomerene remained active in politics.  He withdrew as a Democratic candidate for President in 1928 in favor of Alfred E. Smith and was later appointed by President Hoover to chair the Reconstruction Finance Corporation in 1932.

of New York in 1916.[28]

Another famous investigator was the highly partisan Thomas E. Dewey, who actively sought appointment as a New York prosecutor to investigate mob criminal activity in 1935. "[F]rom the outset, Dewey and his allies saw the prosecutor's post as a stepping-stone to the governorship and the White House," and it was widely suspected that Dewey's mentor, United States Attorney George Medalie, promoted Dewey for the position to gain control of the Republican party.[29] After a long delay, Dewey was "reluctantly designated" by the Democratic Governor.[30] Driven by ambition, Dewey pushed his staff relentlessly, searched for a case "that would bring glory to his investigation," and in the process incited Mayor La Guardia to fits of jealousy. Ultimately, however, Dewey brought down bootlegger Waxey Gordon, various mafia loan sharks, and Lucky Luciano, feats which no other New York prosecutor had even dared.[31] Republican Dewey's prosecutorial fame later helped him become Governor of New York, and he made three unsuccessful runs for the Presidency, losing narrowly to President Truman in the 1948 presidential election.

Yet another well-known example of a politically active prosecutor who furthered his political career by successfully fighting official misconduct was "Big Jim" Thompson, the Republican County Attorney who in the early 1970's investigated corruption by Democratic Chicago politicians and a United States Circuit Judge.

---

[28]Corruption fighter Seabury was a Franklin Roosevelt rival for the Democratic presidential nomination in 1932. He became Mayor Fiorello La Guardia's trusted advisor and made another unsuccessful run for Governor in 1934. Herbert Mitgang, The Man Who Rode the Tiger 335 (1963).

[29]Mary M. Stolberg, Fighting Organized Crime, 65 (1995).

[30]Rupert Hughes, Attorney for the People, 60 (1940).

[31]Stolberg, supra note 29, at 99, 107-08, 116.

Success in indicting and convicting members of Mayor Daley's machine helped propel Thompson to the governor's mansion and national political prominence.

Just as successful investigators of the past were usually political activists, the government officials under investigation invariably sought to undermine their efforts with charges that the investigations were tainted by partisan politics. The Teapot Dome scandal was shrouded in partisan debate. Democrats initiated the call for investigation and used congressional hearings to attack Republicans, for example, by staging debates with empty Republican chairs demanding to know more of the crisis.[32] Conversely, investigators Roberts and Pomerene endured numerous attempts by the Republican administration to sabotage the investigations. At the Departments of Justice and the Navy, books were unavailable, requests for information ignored, witnesses could not recall key information, and on occasion sensitive materials had to be taken by force.[33] Pomerene and Roberts ultimately won convictions, but the accused maintained they were victims of shrewd maneuvering by Democrats who had railroaded them into jail.[34]

Judge Samuel Seabury also found that entrenched political power rarely gives ground without a fight. When Tammany Hall's initial roadblocks caused Seabury to intensify his investigations, those in power -- from Mayor Jimmy Walker down to the lowest City clerk -- responded by blocking Seabury's staff, cutting his budget, and forcing him to get court orders to obtain records.[35] Judge Seabury's investigations were assailed by Democrats and Republicans alike, whenever it suited their own political agendas. A common Tammany Hall tactic was to attempt to turn Seabury's

---

[32]Burl Noggle, Teapot Dome: Oil and Politics in the 1920's, 167-68 (1962).

[33]Werner & Starr, supra note 27, at 161-68.

[34]Werner & Starr, supra note 27, at 280.

[35]Mitgang, supra note 28, at 196-97.

investigation into a political battle.[36]  Similarly, attorneys opposing prosecutor Thomas Dewey found it useful during closing arguments to tell jurors that Dewey was really running for Governor of New York.[37]  And when Jim Thompson prosecuted Judge Otto Kerner, a former Illinois Governor and Mayor Daley confidante, Kerner claimed he was the victim of a political witch hunt, while others claimed that President Nixon was seeking revenge from Illinois Democrats because he failed to carry the State in 1960.[38]  A plethora of interviews, articles, and books painted Thompson as a politically motivated opportunist, and similar allegations were leveled by Cook County Clerk Edward Barrett after his conviction.[39]

History's message is clear -- investigating misconduct by those in high office is bruising political work.  That message is confirmed by our more recent experience under the Independent Counsel Act.  Targets from both political parties have invariably decided that the best way "to blunt the political damage posed by an investigation is to attack as biased the [independent counsel], or the judges that appointed him."[40]

The question, then, is whether the judiciary should interfere in this process in the manner suggested by Judge McMillian and Judge Eisele, mounting judicial investigations of independent counsel whenever a citizen identifies an apparent political conflict of interest.  In my view, the answer is a resounding no.  America has benefitted from a long tradition of investigators and prosecutors who have zealously worked to

---

[36]Mitgang, supra note 28, at 224-226, 259.

[37]Stolberg, supra note 29, at 148.

[38]Hank Messick, The Politics of Prosecution, 102 (1978); Robert E. Hartley, Big Jim Thompson of Illinois 43 (1979).

[39]Hartley, supra note 38, at 55, 59.

[40]Julie O'Sullivan, The Independent Counsel Statute, 33 Am. Crim. L. Rev. 463, 464 (1996).

uproot deeply entrenched official misconduct. Some of the most successful were activists with well-publicized political ambition. Most were derided for harboring partisan viewpoints and personal ambition. Such charges are to be expected when the political stakes are high. The very reason political activists are effective prosecutors is because of their "impure" political motives. Conversely, the worst corruption occurs when one political party is dominant, precisely because a healthy political opposition will stimulate investigation and, if needed, reform.[41] If judges undertake to "investigate the investigators," using vague standards such as apparent political conflict of interest,[42] it will inevitably politicize the judiciary and weaken legitimate efforts to weed out misconduct.

If independent counsel are to accomplish the purposes for which successive Congresses have created and consistently supported that Office, general allegations of partisanship, past political activity, and future political ambition cannot be grounds to disqualify an independent counsel or to launch a distracting judicial investigation. Of course, the judiciary must intervene when any prosecutor has a personal or financial conflict of interest in a particular prosecution, or otherwise infringes the rights of a criminal defendant or a target of a grand jury investigation. But Mr. Mandanici brings

---

[41]George C.S. Benson, Political Corruption in America 65 (1978).

[42]Judge McMillian argues that I have inaccurately characterized his concerns as being limited to Mr. Starr's apparent political conflict of interest. See ante p.11, note 15. It is true that Judge Eisele's opinion focused on Starr's alleged "personal, financial, and career interests." But in this situation, Mr. Mandanici's assertion of a personal conflict of interest is nothing more than a thinly veiled attack on Mr. Starr's perceived political ambitions, like the attacks on prosecutors Seabury, Dewey, and Thompson in prior years. In other words, in this context, the perceived personal conflict of interest is a political conflict of interest. Moreover, the possibility that success may enhance a prosecutor's career and thereby lead to *future* financial rewards does not alter the basic nature of the alleged conflict -- the prosecutor's political views and ambitions. What Mr. Mandanici fears is that success may propel Independent Counsel Starr's political, *i.e., his personal, financial, and career* advancement.

no such specific charges. He simply wants the judiciary to shackle this independent counsel to serve his own political goals. There is nothing wrong with citizen Mandanici having a political agenda. But it would be wrong, that is, unsound in both theory and practice, for the judiciary to provide a forum to further that political agenda. The district court was wise not to take action on his complaints.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.