**Jim Guy TUCKER Petitioner**

v.

**UNITED STATES of America Respondent**

Nos. 4:00CV00630 GH, 4:95CR00173.

United States District Court,
E.D. Arkansas,
Western Division.

June 16, 2003.

Jeffery M. Rosenzweig, Esq., Elizabeth Robben Murray, Esq., Little Rock, for Petitioner.

D. Thomas Ferraro, Esq., U.S. Attorney's Office, Texankana, TX, Julie Thomas, Esq., U.S. Department of Justice, Office of the Independent Counsel, Alexandria, VA, for Respondent.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Petitioner Jim Guy Tucker ("Tucker") has filed a motion to vacate his sentence under 28 U.S.C. § 2255. On August 17, 1995, a grand jury in the Eastern District of Arkansas indicted Tucker along with James McDougal and Susan McDougal in a twenty-one count indictment, of which Tucker was indicted on eleven counts. At the time of the indictment, Tucker was the Governor of the State of Arkansas. Count I of the indictment charged the defendants with a conspiracy to misuse the funds of Madison Guaranty Savings and Loan, a thrift institution that failed, and Capital Management Services, a small business investment company headed by alleged co-conspirator David Hale. On May 28, 1996, the jury convicted Tucker of the conspiracy and one count of mail fraud in connection with a loan from Capital Management Services to Castle Sewer and Water Corporation. The Court granted a judgment of acquittal during the trial on four counts relating to a loan by Capital Management Services to The Communication Company, and the jury acquitted Tucker on five counts, three of which alleged fraud in connection with a loan to Dean Paul and two of which alleged misapplication of Capital Management's money and causing false statements to be entered in the books and records of Capital Management in connection with a loan by Capital Management of Southloop Construction.

**1026**

## FACTUAL BACKGROUND [1]

In the mid–1980s, Tucker was a lawyer in Little Rock. He did business with co-defendants James McDougal and Susan McDougal, who owned a savings and loan, Madison Guaranty Savings & Loan Association ("Madison Guaranty"). Tucker's law firm was general counsel to Madison Guaranty and represented it in numerous matters. Tucker also represented David Hale, a Little Rock municipal judge, who ran a Small Business Investment Company, Capital Managment Services ("CMS"). Tucker on occasion borrowed from CMS which was financed by the federal Small Business Administration ("SBA"), and was supposed to only lend to economically and socially disadvantaged business persons.

In the fall of 1985, Tucker, James McDougal and Hale schemed to perpetrate a series of frauds. The key to the scheme was a fraudulent transaction by which $500,000 from Madison Guaranty was funneled to Hale, which he invested in CMS. The funneling of the money was accomplished by means of a nominee loan of $825,000.00 from Madison Guaranty to Dean Paul, an associate, who used the money to purchase three pieces of property from Hale at grossly inflated prices to generate a $500,000.00 "profit." Robert Palmer, who testified at the trial, prepared fraudulent appraisals to support the inflated prices.[2] After Hale invested the $500,000.00 "profit" from the fraudulent sales, the SBA provided funding to CMS for lending at about a 3 for 1 ratio; thus, the "profit" netted nearly $1.5 million in additional federal funding.

As part of the scheme, CMS made four fraudulent loans to designees of Tucker and James McDougal, two of which are of importance here. One loan was a $65,000.00 fraudulent loan to Stephen Smith d/b/a The Communications Company, who used the money to pay off a debt of partnership that included himself, Tucker and James McDougal.[3] Smith testified as a government witness at Tucker's trial. Another loan was a $150,000.00 fraudulent loan to Castle Sewer and Water, a company of which Tucker owned two-thirds. Tucker submitted fraudulent documents regarding this loan, and he was convicted of one count of mail fraud for causing Hale to submit false documentation to the SBA regarding this loan. R.D. Randolph, who owned the other third of Castle Sewer and Water, testified for the government at the trial.

In 1986, federal regulators audited Madison Guaranty and concluded that numerous real estate transactions financed by Madison Guaranty were shams involving insiders. One of the transactions so identified was the Castle Grande development south of Little Rock. In October, 1985, Tucker purchased a 34–acre parcel of Castle Grande, which was wholly financed by Madison Guaranty. On February 28, 1986,

---

**1.** The case against Tucker is outlined in *United States v. Tucker*, 137 F.3d 1016, 1019–1021 (8th Cir.1998). *See also United States v. Susan H. McDougal*, 137 F.3d 547, 550–52 (8th Cir.1998) and *United States v. James B. McDougal*, 133 F.3d 1110, 1112–13 (8th Cir.1998).

**2.** Palmer later pleaded guilty to conspiring to violate 18 U.S.C. § 1006, which prohibits false statements in savings and loans records. The Court, on June 16, 1995, sentenced Palmer to three years probation, the first year on home detention, and a $5,000.00 fine. On January 20, 2001, President Clinton granted Palmer an unconditional pardon.

**3.** Smith pleaded guilty to a misdemeanor count of conspiring to misapply loan proceeds from a small business investment company in violation of 18 U.S.C. § § 371 and 657, and was sentenced to one year probation, and a $1,000.00 fine. *See In re Smith v. Starr*, 99 F.Supp.2d 1037, 1038 (E.D.Ark.2000). Smith also received an unconditional pardon from President Clinton.

Castle Sewer and Water purchased for $1.2 million, the sewer and water utility located in the Castle Grande development. The $150,000.00 down payment for this purchase was made with the proceeds of the $150,000.00 loan from CMS. The remainder of the purchase price was financed by Madison Guaranty.

In July, 1986, the McDougals were removed from control of Madison Guaranty. Investigations followed. In 1989, a grand jury charged McDougal and his brothers-in law, Jim and David Henley, with conspiracy to commit bank fraud involving two transactions arising from development of a four hundred acre tract of land known as the 145th St. property. All defendants were acquitted. *See United States v. James B. McDougal,* 133 F.3d 1110,1112 (8th Cir.1998).

In February, 1990, John Latham, Madison Guaranty's former president, pled guilty to a felony count of falsifying Madison Guaranty's records. His guilty plea related to false entries he had made in connection with a Castle Grande transaction. Latham agreed to cooperate with the government. In 1990, the Resolution Trust Corporation ("RTC") closed Madison Guaranty.

On September 1, 1992, the RTC submitted a criminal referral to the U.S. Attorney for the Eastern District of Arkansas and the FBI Little Rock office concerning criminal allegations involving Madison Guaranty and other entities controlled by James McDougal, the principal shareholder. The other entities included the Whitewater Development Company, Inc., a real estate venture owned by McDougal and his wife Susan McDougal along with then Governor Bill Clinton and Hillary Clinton. The referral named James and Susan McDougal as suspects and Governor and Ms. Clinton as witnesses. The RTC agents prepared an additional nine criminal referrals on Madison Guaranty between June and September, 1993. The nine referrals named McDougal as a suspect and Tucker was named as a suspect in two.[4]

In May of 1993, the SBA sent a criminal referral to the FBI in Little Rock detailing possible crimes committed by David Hale in his conduct of the affairs of CMS. The SBA believed that Hale had fraudulently concealed non-performing loans by making subsequent loans to payoff the non-performing loans.[5] The FBI executed a search warrant for the offices of CMS on July 21, 1993. The agents seized loan files and other documents relating to Susan McDougal's $300,000 Master Marketing Loan. The FBI also found evidence of a fraudulent transaction from September 1998 involving Hale and Little Rock attorneys Charles Matthews and Eugene Fitzhguh. On September, 23, 1993 Hale, Matthews and Fitzhugh were indicted by a federal grand jury in Little Rock for defrauding the SBA. On the day of his indictment, Hale publicly alleged that Governor Tucker and President Clinton were involved in his conduct of CMS.

---

**4.** The criminal referrals are described in Appendix 3, Robert W. Ray, *Final Report of the Independent Counsel, In Re: Madison Guaranty Savings & Loan Association,* Volumes I and II, filed March 2, 2001, Released March 20, 2002 Washington D.C. (hereinafter "Final Report"). The Final Report is available at http://icreport.access.gpo.gov

After the resignation of Kenneth W. Starr, Robert W. Ray was appointed Independent Counsel, under 28 U.S.C. § 593(e). On June 30, 1999, the Independent Counsel Reauthorization Act of 1994, 28 U.S.C. §§ 591 through 599 (1994) expired. Under 28 U.S.C. § 599, the Independent Counsel was authorized to issue a Final Report.

**5.** Among the loans listed was a $300,000.00 loan to Susan McDougal. She was convicted on four counts for her role in this loan. *See United States v. Susan H. McDougal,* 137 F.3d 547 (8th Cir.1998).

In November, 1993, Paula Casey, the United States Attorney for the Eastern District of Arkansas, recused herself and her entire staff from the Hale, Fitzhugh and Matthews prosecution as well as all matters involving Madison Guaranty and CMS because of allegations linking President and Mrs. Clinton with CMS. *See United States v. Tucker*, 78 F.3d 1313, 1315 (8th Cir.1996); *United States v. Fitzhugh*, 78 F.3d 1326, 1328 (8th Cir.1996). Responsibility for Hale's prosecution and the ten RTC Madison Guaranty criminal referrals was transferred to the Fraud Section of the Criminal Division of the Justice Department.

On January 12, 1994, President Clinton directed Attorney General Janet Reno to appoint an independent prosecutor. At the time, the independent counsel provisions of the Ethics in Government Act had lapsed in accord with the statute's sunset provision, and had not yet been reauthorized. On January 20, 1994, Attorney General Reno appointed Robert B. Fiske, Jr., a former United States Attorney for the Southern District of New York, as regulatory Independent Counsel pursuant to Department of Justice regulations. 28 C.F.R. § 600.1 (1993). He was given authority to investigate "whether any individuals or entities have committed a violation of any federal criminal or civil laws relating in any way to President ... Clinton's or Hillary ... Clinton's relationships with 1) Madison Guaranty .. 2) Whitewater Development Corporation, or 3)[CMS]." 28 C.F. R § 603.1 Fiske took over the pending proseuction of Hale, Fitzhugh and Matthews, as well as the investigation of the Madison Guaranty criminal referrals.

In March, 1994, Hale agreed to plead guilty to one felony violation of 18 U.S.C. § 371 (conspiracy) and one felony violation of 18 U.S.C. § § 1341 and 2 (mail fraud) and to cooperate with the government.[6] Hale provided substantial assistance to the government.[7]

On June 30, 1994, President Clinton signed the Independent Counsel Reauthorization Act of 1994 into law.[8] On July 1, 1994, the Attorney General requested the appointment of an independent counsel. In her application to the Special Division of the Court for the appointment, the Attorney General requested that the Court appoint Fiske so that he could continue his investigation.[9] The Special Division de-

---

**6.** Fitzhugh and Matthews went to trial on felony charges of conspiring to defraud the SBA. During the trial, they pleaded guilty to a misdemeanor violation of 18 U.S.C. § 215, bribery with intent to influence an official of a financial institution. Fitzhugh was ultimately sentenced to five months in a halfway house, followed by five months in home detention and one year supervised release, and a $3,000.00 fine. Matthews was sentenced to 16 months imprisonment, 1 year supervised release, and a $7500.00 fine.

**7.** Hale was sentenced on March 25, 1996, after the expiration of the initial Whitewater grand jury on March 23, 1996. He was sentenced to 28 months imprisonment, 3 years supervised release, fined $10,000.00 and ordered to pay restitution in the amount of $2,040,000.00 to the SBA. Hale remained imprisoned from the end of June, 1996, until February 6, 1998, when his term of imprisonment reduced to time served and the fine was abated pursuant to the government's Rule 35 motion.

**8.** On June 30, 1994, President Clinton signed into law "The Independent Counsel Reauthorization Act of 1994," 28 U.S.C. § § 591–599. *See United States v. McDougal*, 906 F.Supp. 499, 500 (E.D.Ark.1995) (discussing statutory provision of Independent Counsel Act). *See also United States v. McDougal*, 906 F.Supp. 494 (E.D.Ark.1995) (holding certain provisions of Independent Counsel Reauthorization Act of 1994 constitutional)

**9.** The Special Division is a division of the United States Court of Appeals for the District of Columbia which is authorized to appoint independent counsels. *Id.* at 501 n. 4.

clined the suggestion and appointed Kenneth W. Starr as Independent Counsel on August 5, 1994.[10] Starr continued the investigation of matters begun by Fiske, such as allegations of bankruptcy and tax fraud by Tucker, as well as related matters as the investigation progressed.

On June 7, 1995, a grand jury in Little Rock returned an indictment against Tucker, his attorney, John Haley, and his business partner, Williams Marks, for tax fraud, bankruptcy fraud, making false material statements, and a conspiracy to commit various of these acts. The allegations related to a fraudulent scheme to conceal substantial profits from the sale of various cable ventures in order to avoid paying greater taxes. *See United States v. Tucker*, 78 F.3d 1313, 1316, 1319–20 (8th Cir. 1996).[11]

The grand jury returned a second indictment on August 17, 1995, which is the basis for this petition. As discussed above, the twenty-one count indictment charged Tucker, and co-defendants James McDougal and Susan McDougal with conspiracy and various counts relating to frauds committed involving the funds of Madison Guaranty and CMS. On May 28, 1996, the jury convicted Tucker of Count I, the conspiracy, and Count 12, mail fraud. The Court sentenced Tucker on August 19, 1996, to four years probation with 18 months home confinement, imposed a $25,000.00 fine and ordered Tucker to pay $150,000.00 in restitution.[12]

Tucker appealed his conviction, claiming that there was insufficient evidence to support the jury's verdict and that he was entitled to a new trial because of juror misconduct. The Eighth Circuit found

**10.** For additional discussion of the appointment of Starr, *see United States v. Tucker*, 78 F.3d 1313 (8th Cir.1996).

**11.** Marks pled guilty on August 28, 1997 to a felony count of conspiring to defraud the United States in violation of 18 U.S.C. § 371, and was sentenced on May 22, 1998, to four years probation, and ordered to pay a $6000.00 fine and $1,000,000 in restitution. Haley pled guilty on February 20, 1998, to a misdemeanor count of violating 26 U.S.C. § 7203, willful failure to pay tax, and on August 20, 1998, was sentenced to 3 years probation and ordered to perform community service. On February 28, 1998, Tucker pleaded guilty to conspiracy to defraud the United States in violation of 18 U.S.C § 371. He was sentenced on May 17, 1999, to 4 years probation, and a $6,000.00 fine, and ordered to pay $1,000,000 in restitution. He appealed the order of restitution, and the Eighth Circuit Court of Appeals remanded for resentencing on the issue of restitution. *United States v. Tucker*, 217 F.3d 960 (8th Cir.2000). The district court, pursuant to an agreement of Tucker and the government, deferred the issue of the amount of restitution to be paid pending resolution of Tucker's civil tax liability with the Civil Examination Division of the Internal Revenue Service. *United States v.*

*Tucker*, case no. 4:95CR00117SR (E.D.Ark.) (document no. 340).

**12.** James McDougal was convicted on eighteen felony counts and sentenced to concurrent terms of five years imprisonment for fifteen of the counts, with two years suspended. On the remaining three counts, imposition of sentence was suspended in lieu of three years' probation. He was fined $10,000.00 and ordered to pay $4,274,301.27 restitution divided between the FDIC and the SBA. McDougal died while incarcerated on March 8, 1998.

Susan McDougal was convicted on four felony counts, and sentenced to twenty-four months imprisonment on three counts, followed by three years of probation, restitution in the amount of $300,000; fine of $5,000.00 and 300 hours of community service. The Court suspended sentence of the fourth count. On June 28, 1998, after McDougal had served 3½ months of her 24 month criminal sentence, the Court commuted McDougal's criminal sentence to time served, and placed her on a period of 90 days home confinement as a condition of her probation. *United States v. Susan H. McDougal*, 16 F.Supp.2d 1047 (E.D.Ark.1998). President Clinton granted her an unconditional pardon.

sufficient evidence to support the convictions but remanded to this Court for further fact finding on the juror misconduct issue. *United States v. Tucker*, 137 F.3d 1016 (8th Cir.1998). The Court conducted an evidentiary hearing and found that the juror had not been dishonest in her answers to voir dire questions and that she had not been subjected to outside influence during trial. Thus, the Court denied the motion for new trial. *United States v. Tucker*, 36 F.Supp.2d 1110 (E.D.Ark.1999). The Eighth Circuit Court of Appeals affirmed. *United States v. Tucker*, 243 F.3d 499 (8th Cir.2001), and the United States Supreme Court denied Tucker's petition for writ of certiorari, *Tucker v. United States*, 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001).

Tucker filed a motion to vacate his sentence under 28 U.S.C. § 2255 while his appeal was still pending. He filed a supplement following the denial of his petition for certiorari.

Tucker contends that the convictions should be vacated because of the failure of the Office of Independent Counsel ("OIC") to disclose various benefits received by witness David Hale as required under *Brady v. Maryland*, *Giglio v. United States*, and their progeny. In particular, Tucker states that the OIC failed to disclose Hale's repeated contacts and financial benefits he received, while under OIC and FBI guard or supervision, with those parties or individuals seeking to damage Tucker and President Clinton. Tucker also contends that the convictions should be vacated because of the conflicts of interest of Starr.

## MOOTNESS

■ Before discussing the merits of Tucker's petition, the Court will address the government's contention that the petition is moot. According to the government, because Tucker has completed his term of probation he no longer suffers a concrete and continuing injury. *See Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (once sentence has expired some concrete and continuing injury other than completed incarceration or parole must exist to maintain challenge to validity of conviction). The Court, however, has generally presumed that "most criminal convictions do in fact entail adverse collateral legal consequences." *Sibron v. New York*, 392 U.S. 40, 55, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Here, Tucker has presented concrete evidence of collateral consequences of his conviction. Tucker states that he was disbarred because of his conviction in this case. Additionally, Tucker contends that he is unable to obtain employment with a financial institution because of his conviction.

The Court finds that because of these tangible collateral consequences, Tucker's petition is not moot.

## BRADY ISSUE

During pretrial discovery, Tucker sought information regarding the arrangements the government had with Hale as well as what benefits he had received. In particular, Tucker sought information regarding meetings or conversations Hale had with certain individuals or organizations known to be politically opposed to President Clinton, and what financial benefits he received from them. These organizations or individuals included members of the Republican Party, American Spectator Magazine, the Bradley Foundation, and The Landmark Foundation, or any person who is against Clinton or is considered from the "right." The government in response to the motion to compel all arrangements with David Hale stated that it had no independent knowledge of such contacts. Tucker contends that the use of the term "independent knowledge" was an at-

tempt to mislead the Court and Tucker into a belief that the OIC had "no knowledge of a network of anti-Clinton and anti-Tucker political activists, some with close connections to the [OIC], aiding and communicating regularly with Hale." (Petition to Vacate, p. 10). Tucker's co-defendants also sought discovery regarding benefits provided to Hale. James McDougal, in his motion, requested information regarding any arrangements concerning the representation by Starr's former law partner, Theodore Olson, of Hale and whether Hale had been on any "fishing trips" with FBI agents.

In response, the OIC stated that neither Starr nor anyone from the OIC had asked Olson to represent Hale or discussed the matter with Olson. The OIC claimed no knowledge of any fee arrangments between Olson and Hale. Furthermore, the OIC consistently stated that it had provided all *Brady* and *Giglio* material and was in compliance with the Court's orders.

Tucker contends that the OIC kept hidden information regarding the relationships the OIC had with Theodore Olson, "billionaire and Clinton-opponent" Richard Mellon Scaife, the "Arkansas Project" and other private entities who engaged in a campaign to discredit President Clinton.[13] According to Tucker, information now in the "public domain" establishes the connection between Hale and political opponents of President Clinton, of which the OIC should have been aware and which it failed to disclose.

Tucker makes much of the fact that Hale was associated with individuals from the *American Spectator* magazine, the Ar-

kansas Project as well as Clinton-opponent Richard Mellon Scaife, and that he received financial benefits from those forces seeking to discredit Clinton. He also makes much of the fact that individuals from the *American Spectator* magazine helped recruit Theodore Olson, a former law partner of Starr, to represent Hale and that Olson and his firm provided some $140,000 in legal services to Hale which Hale still owes. Additionally, Tucker points out that there is a contradiction in Hale's testimony at trial based on new information that has now been revealed. That is, Hale testified at trial that he retained Olson in December, 1993, while Olson stated that he began representing Hale a few months earlier.

The activities of certain "right wing" or anti-Clinton forces have been outlined in a number of newspaper articles and books. Tucker relies on excerpts from *The Hunting of the President*, by Gene Lyons and Joe Conason, (St. Martin's Press, New York, 2002) as well as articles from the online magazine *Salon*. He also has submitted the affidavit of Caryn Mann, who contends that in 1994 and through most of 1995, the FBI moved Hale into a rental unit near Hot Springs owned by Parker Dozhier, an individual who had received money from the *American Spectator* and Stephen Boynton, an attorney associated with the *American Spectator*. Mann averred that Dozhier provided Hale certain benefits, such as an automobile, a free rental unit and cash from funds provided by the *American Spectator* and Boynton. (Ex. 9 to Petitioner's Motion to Vacate Sentence).[14]

---

**13.** The "Arkansas Project" has been described as a four-year $2.4 million campaign financed by the wealthy conservative philanthropist Richard Mellon Scaife to uncover wrongdoing by the Clintons in Arkansas. *See* Gene Lyons and Joe Conason, *The Hunting of the President* at 111 (St. Martin's Press, New York, 2002);

David Halperin, *Ethics Breathrough or Ethics Breakdown? Kenneth Starr's Dual Roles as Private Practitioner and Public Prosecutor,* 15 Geo. J. Legal Ethics 231, 247 (2002).

**14.** Mann's allegations were investigated by the Michael Shaheen. *See infra.*

Tucker contends that the OIC was aware of Hale's contacts with political opponents of Tucker and Clinton and that the OIC went to great lengths to keep hidden information regarding subsidies and contacts of those individuals with Hale.

There is no doubt that Hale was a crucial witness in the case against Tucker. *See Tucker,* 137 F.3d at 1019 (Hale was alleged co-conspirator and key government witness). He is a former municipal judge who obtained leniency from the OIC in exchange for his testimony claiming that President Clinton, and others, including Tucker, perceived to be associated with President Clinton had committed crimes. There is also no doubt that Hale's credibility was an issue at trial.

Tucker asserts that the OIC provided false, inaccurate or misleading responses to the motions to compel. He argues that evidence of Hale's association with anti-Clinton and anti-Tucker forces as well as his receipt of benefits from these individuals goes to the issue of Hale's motive to offer testimony adverse to Tucker. Tucker contends that such information was material as it went to financial and political motivations for Hale to make accusations against Tucker and President Clinton. The failure of OIC to provide that information, according to Tucker, deprived him of the tools to properly cross-examine and impeach Hale.

■■■ *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, make clear that the government must provide a defendant with exculpatory evidence. The failure of the prosecution to provide evidence favorable to an accused "upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The duty to disclose encompasses impeachment evidence as well as exculpa-

tory evidence, *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and evidence affecting the credibility of an essential witness. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The duty to disclose is applicable even though a defendant has not made a request. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342(1976). The rule includes evidence known only to police investigators and not to the prosecutor and therefore to comply with the dictates of *Brady,* "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

■■■ To establish a *Brady* violation, the accused must show that the evidence at issue was favorable to him or her, either because it is exculpatory, or because it is impeaching; that the evidence must have been suppressed by the prosecution, either willfully or inadvertently; and that the evidence was material. *Dye v. Stender,* 208 F.3d 662, 665 (8th Cir.2000).

Evidence is material, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Materiality is to be determined not by a sufficiency of the evidence test, but rather by consideration of what the government's case would have looked like if the defense had had access to the [suppressed evidence] Materiality is not established through the mere possibility that the suppressed evidence might have influenced the jury.

*United States v. Carman,* 314 F.3d 321, 324 (8th Cir.2002) (internal quotation marks and citations omitted).

The government contends that it did not suppress any evidence favorable to Tucker. It states that allegations concerning the government's knowledge of any improper payments or benefits to Hale have been thoroughly investigated. In April, 1998, the Attorney General requested the OIC to investigate reports that Hale may have received cash and other things of value in exchange for providing false testimony as a cooperating government witness. In May, 1998, with the concurrence of the Department of Justice, Starr established the Office of Special Review ("OSR"). He appointed Michael E. Shaheen, formerly the Director of the Department's Office of Professional Responsibility, to conduct an independent investigation into whether there had been violations of criminal law based upon Hale's alleged receipt of a thing of value in exchange for his testimony, *see* 18 U.S.C. §§ 201, 1503, 1510 and 1512, and to report his findings to two former federal judges, Arlin Adams and Charles Renfrew, functioning as independent oversight judges for the purpose of the investigation.

Shaheen convened a grand jury in the Western District of Arkansas, and conducted a 13–month investigation, during which the OSR interviewed more than 160 witnesses. At the conclusion of the investigation, Shaheen submitted a final report to the two judges on the oversight panel. The oversight panel accepted the report and authorized its submission to the OIC. Upon receipt and acceptance of the report,

the OIC released a public statement, which stated in part, that the OSR concluded that "many of the allegations, suggestions, and insinuations regarding the tendering and receipt of things of value were shown to be unsubstantiated or, in some cases, untrue." The OSR further found that there was insufficient evidence to support criminal charges. "In some instances there is little if any credible evidence establishing that a particular thing of value was demanded, offered or received. In other instances, there is insufficient credible evidence to show that a thing of value was provided or received with the criminal intent defined by any of the applicable statutes." [15]

Even assuming that Tucker established that the government suppressed evidence regarding Hale, Tucker cannot establish that the suppressed evidence was material.

Hale testified for nine days during the trial.[16] The Court has reviewed the transcript of the proceedings. Although the cross-examination is extensive, the Court includes below some of the passages to demonstrate that Tucker and his co-defendants thoroughly probed Hale's credibility.

Hale was questioned regarding his associations with political enemies of President Clinton and Tucker.

> Q: [by Counsel for James McDougal] Did you contact Justice Jim Johnson in Conway, Arkansas over 30 times between September of 1993 and December the 21st of 1993?
>
> A: If that record shows I did.
>
> . . .

---

**15.** The Court recognizes that the failure of the OSR to find any criminal violation does not dispose of Tucker's *Brady* claim that he was entitled to have known of information regarding subsidies at the time of trial. It does, however, serve to undercut Tucker's contention that government agents, as well as the OIC, were somehow involved in providing undisclosed benefits to Hale which were not made known to Tucker.

**16.** Hale began testifying on April 1, 1996 (Tr. 3045). Cross examination by McDougal's counsel began on the fourth day, April 4, 1996 (Tr. 3541).

Q: And you knew that Justice Jim Johnson hated Bill Clinton, didn't you?

A: Not at that time I didn't.

Q: And, in fact were you aware of a connection that Justice Jim Johnson had with a Floyd G. Brown who authored a book called *Slick Willie—Why America Cannot Trust Bill Clinton* that came out almost at the time of the Clinton election?

A: I did not know he was a friend of his.

. . . .

Q: Mr. Johnson, Jim Johnson caused you to get in touch with a fellow named David Bossie,[17] didn't he?

A: No sir.

Q: You got in touch with a fellow named David Bossie, didn't you?

A: David Bossie called my attorney.

Q: And David Bossie works under Floyd G. Brown who has an organization called Citizens United, doesn't he?

A: That's my understanding, that's correct.

Q: And he puts out a publication called *Citizens Agenda*, does he not?

A: I do not know.

Q: And did you not talk with Floyd Brown of Citizens United, did you not conduct an exclusive interview with him in the fall of 1993?

A: I don't know that it was exclusive, but I did conduct an interview over a radio network show.

Q: For Mr. Brown?

A: Well, he was the one that was asking questions, yes, sir.

. . .

Q: And then Mr. Bossie brings a fellow named Ira Silverman to Arkansas, and Ira Silverman is with NBC News, is that correct?

A: They came together, yes, sir.

Q: Yes, sir. And you interviewed in the presence of David Bossie numerous hours with NBC News reporter Ira Silverman, didn't you, sir?

A: It was off and on. It wasn't two full days.

Q: And you worked with him off and on for two days, is that correct?

A: Yes, sir, that's correct.

Q: And you know, Mr. Hale, the only way you could sell your story to the national media was to create the Bill Clinton connection, wasn't it?

A: No, sir, the U.S. Attorney did that.

Q: The U.S. Attorney?

A: Yes, sir, the local U.S. Attorneys's office did that.

Q: I see. I see. In that Ira Silverman interview don't you say, "I want an independent counsel" in November of 1993?

A: Yes, sir.

Q: And wasn't it your goal at that point in time to try to attack Bill Clinton so you could find favoritism among people who disliked and hated Bill Clinton to the point they'd do anything to destroy him?

A: No, sir.

. . .

Q: Mr. Hale, the truth of the matter is, if a conspiracy existed at all in 1985 and early 1986, it was you and Bill Watt and Dean Paul who set out to benefit yourselves financially, wasn't it? Isn't that correct? Isn't that the bottom line? And then you ——

A: No, sir.

Q: —— and then you got caught on an unrelated matter in 1993, and you went back once again to your books and your records and your documents trying

---

**17.** The transcript of the trial spells Bossie's name as Bossie, Bosse and Bossy.

to figure out how you could once again come up with a story to save your own skin. Isn't that true, Mr. Hale?

A: I didn't have my records. I couldn't go back to them, and that's not true. Any time you get involved with one of these schemes, everybody knows what they're doing.

. . .

Q: And you went to Jim Johnson who immediately put you in contact with people who had created the Willie Horton matter that were putting out hate propaganda on a daily basis against Bill Clinton, and you sold your story, didn't you?

A: That's is not true. That is not true. Would you like for me to explain?

Q: I'm finished, Mr. Hale...

(Tr. 3734–3740).

He was questioned regarding the deal he made with the OIC.

Q: [counsel for Tucker] But you went into negotiations for a plea, and . . . you said that you had a 28-month sentence....

Q: Mr. Hale, you also know, of course, through counsel and through your own background as a lawyer, that your case is in the hands of the Independent Counsel?

A: No, it's in the hands of the Judge.

Q: Your case is still—the lawyer for the other side of your case is still Independent Counsel if anything else should come up.... When you appeared for your sentencing, the lawyer who asked for the consideration by the Court of whatever they wanted to ask was your attorney, Mr. Coleman?

A: That's correct.

Q: And then various people who spoke on behalf of Independent Counsel; isn't that correct?

. . .

Q: Mr. Starr was there...

A: Yes, sir.

Q: He's not here today. Now, do you understand and has it been explained to you that under Rule 35 of the Federal Rules of Criminal Procedure that within one year from the date of your sentencing, the court may reduce your sentence to reflect your subsequent substantial assistance in the investigation or prosecution of another person who has committed an offense? Has that been explained to you, that for one year Independent Counsel can reach out to help you? . . .

A: My attorney explained to me—

. . .

Q:; And this statute [Rule 35(b) ] was discussed by you with your attorney, was it not? . . .

A: Yes.

. . .

Q: You understand that Independent Counsel—not the U.S. Attorney—Independent Counsel are the attorneys representing the government in this case?

. . .

A: Yes, sir.

. . .

Q: Do you understand that the law, as it now exists, is that only Independent Counsel can help you? Not even the Judge could help you without their motion, do you understand that?

. . .

A: Under this rule, yes.

. . .

Q: . . . Now, sir, does this situation leave you in a circumstance where you would like for someone to make a motion to reduce your jail sentence? Would you like that?

A: You bet.

Q: All right. And the only people who can do that are the people right here; isn't that true?

A: Under Rule 35, that's correct.

Q: And isn't it also true that you want to be nice to the people that can help you?

A: I try to be nice to everybody.

. . .

Q: . . . But do you want to be nice to these people so they will be nice to you?

A: Like I said, I honestly—

Q: You'll take any help you can get, won't you?

A: I don't think I'd be human if I wasn't —— didn't. I have to be honest about it. I wouldn't be human if I didn't want to. I don't know of anybody in the courtroom that—

Q: Mr. Hale, how, you have at different times lied for different reasons, haven't you?

A: Yes, sir, I have.

Q: Now, to go back to the Townsend transaction just briefly, those lies were told to get $900,000.00?

A: Yes, they were.

Q: And you wanted the 900,000?

A: Yes, I did.

Q: You wanted it very badly?

A: Yes, I did.

Q: So we know you will lie for money, don't we?

A: Yes, I did.

Q: Would you lie for your liberty, Mr. Hale?

A: Not now, I wouldn't.

Q: You would have at some other time, but not today?

A: That's correct.

Q: All right. So yesterday you might have, but not today?

A: I would not under any circumstances anymore. With what I've been through, you couldn't tie me to a post

every morning and whip me before breakfast to make me do that again.

Q: Mr. Hale, would you lie to please your new friends, Independent Counsel, so that they might look kindly upon you and help you cut that 28 months?

A: They told me if I lied, they'd prosecute me again . . .

(Tr. 3776—3785).

Hale was also questioned regarding the benefits he received from the government.

Q: [By Tucker's counsel]: Was part of the deal that you would be paid living expenses?

A: No, sir.

Q: That came up later?

A: No, sir.

. . .

Q: . . . Did you get paid money by the government?

. . . .

A: Yes, sir.

Q: Were you paid in currency?

A: Yes, sir.

Q: And I think we've had different amounts mentioned, but I believe it's about $63,000.00 to date that you have been paid; is that correct?

A: I do not know.

Q: Did you pay any income tax on the cash handed to you by the government, by the FBI?

A: I don't think—I don't think I filed income tax this year.

Q: All right. Now, you received that money over what years? When did you start getting that cash money? Was it in '94?

A: Late '94, yes, sir.

Q: So you received some cash in '94?

A: Yes, sir.

Q: Did you report that on your income tax for '95?

A: I don't believe I did, no, sir.

. . .

Q: So you had then currency received all through 1995, and still some now in '96, isn't that correct?

A: That's correct.

. . .

Q: You don't figure to pay any taxes on that money, do you?

A: I really hadn't thought about it.

Q: All of the money they give you, you spend on things you'd be [spending] on if you never had a problem. Isn't that true, like food, like a place to live?

A: That's true.

Q: You'd be doing that if nothing had ever happened to you, isn't that right?

A: That's correct, I would.

Q: So you have tax-free money of at least $63,000.00 in your pocket, spent on you; isn't that true?

A: I don't have any in my pocket, and I don't know whether it's taxable or not. I don't know. I can't answer that for you.

(Tr. 3791–3795).

Tucker's counsel also questioned Hale about his association with individuals who were attempting to discredit President Clinton.

Q: [by Tucker's counsel] Do you recall that you gave an interview to NBC? You went with a Mr. Bossy and Mr. Silverman and gave an interview at NBC?

A: Yes, sir.

Q: Do you recall you went over what you were going to say, at least with Mr. Bossy, before you spoke at that meeting?

A: No, sir, I didn't.

Q: You didn't speak about it to Mr. Bossy?

A: I spoke with Mr. Ira Silverman.

Q. And did you say to Ira Silverman and NBC and the world, whoever watched the television, that "At the time these people were friends. They had problems and I agreed to take a chance to assist them." Then NBC said, "Even if that chance, even if by doing that you were breaking the law?" And you said, "Yes, sir." And NBC said, "You did that out of friendship and out of what you felt was political necessity here in Little Rock?" And you said, "That's correct.." Is that what you said to NBC?

A: I'm sure it is if that's the transcript.

Q: You didn't say to NBC, did you, that you did this in order to get the Dean Paul property sold. You said out of friendship.

A: Yes, sir.

Q: That's what you said to NBC.

A: Yes, sir.

. . . .

Q: And NBC said, "And they [Tucker and James McDougal] told you about the problems in the political family." And you said, "Yes, sir. Well, when I went down to the first meeting, we just basically talked about the property they were developing out there and about the SBIC. It was the follow up meetings that McDougal advised me that he-there was some need, that there was an audit coming up and there was some cleaning up that needed to be done in the political family."

[Q]: Did you say those words to NBC on television with Mr. Bossy there and with Ira Silverman asking questions?

A: I don't remember. I don't know whether Mr. Bossy was there. It was Mr. Silverman and an NBC cameraman and my lawyer were sitting in the room. That's; the only people that were in the room.

Q: And was Mr. Bossy on the premises?

A: I believe he was somewhere else in the office but he was on the premises, yes, sir.

Q: This was done in your lawyer's office?

A: Yes, sir.

Q: So Mr. Bossy had come there with you that day?

A: No, sir, he hadn't come with me.

Q: He met you there?

A: Yes, sir. Mr. Silverman met me there, yes sir.

Q: And Mr. Bossy met you there?

A: He was with Mr. Silverman.

(Tr. 3899–3902)

Counsel explored Hale's motive in speaking to the press.

Q: [by Tucker's counsel] Now, did Mr. Coleman [Hale's attorney at the time] or anyone say to you that they were interested in getting something interesting about Mr. Clinton?

A: No, sir.

Q: Never said that. You weren't aware that they had any particular interest in the President of the United States?

A: Sure I did, but they didn't say.

Q: They didn't have to say that, did they? You knew that.

A: Anytime a major television station comes, that's what they are interested in, yes, sir: major television network, yes, sir.

(Tr. 3908).

Q: Mr. Hale, we touched on this the other day, when the FBI came to your place of business in July 1993 you, of course, employed counsel quickly?

A: Yes, sir.

. . . .

Q: .. [Y]ou employed an attorney and I believe he was Mr. Randy Coleman.

A: That's correct.

Q: And he was with a firm called Skokos and Coleman?

A: That's correct.

Q: You are quite aware of politics in Arkansas I think you said?

A: Yes, sir.

Q: And you contributed to both sides?

A: Yes, sir.

Q: We went through the $2,000 for Frank White? [18]

A: Yes, sir.

Q: But you also contributed to the other side?

A: Yes, sir.

Q: So you know who is who?

A: Yes, sir. I know most of them, yes, sir

Q: all right. And you knew, of course, that Mr. Coleman's law partner Mr. Skokos was in the Sheffield Nelson campaign group as finance chairman? [19]

A: He was in 1990, and I believe he was in 1994.

Q: All right. And you knew that Mr. Coleman was his law partner?

A: Yes, sir.

Q: Because you went to their office lots of times, didn't you?

A: Yes, sir.

Q: And at that point you had never made any public statements that the President of the United States was involved in your troubles, had you?

---

**18.** Frank White, the Republican candidate for governor, defeated Bill Clinton in the 1980 general election.

**19.** Sheffield Nelson ran unsuccessfully as a Republic candidate for governor in 1990 and 1994.

A: Nor the governor.

Q: The day you hired the lawyer?

A: Nor Gov. Tucker.

Q: Nor Gov. Tucker. You had never said that publicly.

A: Nor Jim McDougal, nor anybody.

Q: You gave statements to the FBI and to the outfit called Borod and Huggins that said nothing about either one of them in a bad way, is that correct?

A: Jim McDougal, Susan McDougal, nobody, or Steve Smith or any of them.

Q: Not even R.D. Randolph.

A: R. D. Randolph.

Q: You had spoke about them, but you had said that the business that you had with them was honest business?

A: That's correct.

Q: And so you spoke to Mr. Coleman, what you said I can't ask, but after you spoke to Mr. Coleman, did you get in touch with Justice Jim Johnson?

A: No, sir.

Q: You made many phone calls to his telephone number?

A: Yes, sir.

Q: Okay. And then after making those phone calls to his number, did you come to be in touch with a man named Bosse, Dave Bosse in Washington?

A: No, sir.

Q: Did you ever come to be in touch with a Mr. Dave Bosse?

A: Yes, sir.

Q: And you met him through someone or did you just call him directly?

A: No, sir.

Q: Did he call you directly.

A: No, sir. Everybody that called went through my attorney. I didn't talk to anybody unless I went through my attorney.

Q; Through your attorney Mr. Coleman you met Mr. Bosse, would that be correct?

A; That's correct.

Q: And then you spoke with Mr. Bosse?

A: That's correct.

Q: Many times?

A: Several times up into probably late November, December of '93. I don't remember any contact after the first, I'm not saying I didn't but I just don't recall.

Q; Did you have any contact with him at Washington when you went down there to see him?

A: I've never been down there to see him.

Q: He came here?

A: Yes, sir, he came to my attorney's office.

Q: And he was the one that at least had something to do with your television interview with Mr. Silverman of NBC?

A: He was with Mr. Silverman when Mr. Silverman of NBC came, yeah.

Q: Now, before you went on to video tape with Mr. Silverman, you discussed the matter with Mr. Bosse, did you not, your troubles, your contentions, your position?

A: They would ask questions-the way that Randy had set it up, he would require them to, what specific area that they wanted to talk to me about, and he would interview them first and he would advise them that I could not disclose everything, that I would be limited to-they would be limited to a certain area, and then I would sit down in a room with Mr. Coleman most of the time and then with another party.

Q: With the television people?

A: Yes, sir.

Q: And Mr. Bosse?

A: Mr. Bosse was there. I don't recall him being in the room with Randy and Mr. Silverman when I interviewed with NBC.

Q: But in all events there was—at least you have shaken hands with Bosse?

A: Oh, yes, I talked to him, yes, sir.

Q: And you knew Mr. Bosse to be with that Citizens United publication that devotes itself to proving President Clinton is a bad man? [20]

. . . .

Q: Did you know that Mr. Bosse was associated with an entity called Citizens United?

A: No, sir.

Q: Did you know that he had assisted a man named Floyd Brown in writing a book called Slick Willy referring to Mr. Clinton?

A: I had learned that after he had been down here the first time.

Q: Did you know anything else about Mr. Bosse other than he was from out of town?

A: He said he was a volunteer fireman wherever he lived. That's all I remember.

Q: A volunteer fireman?

A: Yes, sir.

Q: But you thought he was just a volunteer fireman?

A: No, sir. I knew he was with the press some way, but he was saying one of the things that he did was also a volunteer fireman.

. . .

Q: And then after you spoke with Mr. Coleman . . . and with Mr. Silverman and you had some conversations of some kind with Mr. Bosse, you gave television interviews?

A: That's correct.

Q: And you gave those interviews to NBC, CNN and ABC?

A: That's correct.

Q: And Mr. Silverman, of course, was only there for NBC?

A: That's correct.

Q: But with each of these interviews you spoke to the —— [21]

(Tr 4066–4073).

Tucker's counsel later inquires:

Q: To go back to where we were when we left off, you had—I believe we had found that you were on television on three networks and that you talked to those networks with your attorney, or through your attorney, would that be correct?

A: That's correct.

Q: And Mr. Bosse was involved, at least with Silverman, and was he involved with the other two, ABC and CNN?

A: No, sir.

Q: Now, you said that there were certain matters that were not to be discussed as you sat down and talked with these people, and then there were matters that could be discussed, is that right?

A: That's correct.

Q: Since you weren't compelled to talk to them by any law, your lawyer got to set the rules over what could be talked about and what couldn't be talked about?

A: Pretty much so, yes, sir.

. . .

Q: So the focus, the entire focus of your talk, was the political scene. That's what they did want to talk about, isn't that correct?

A; The political scene?

---

**20.** After an objection by the Government, the Court instructed the jury to disregard the comment.

**21.** At that point the Court took a 15 minute recess and upon resuming Tucker's counsel went on to a different matter.

Q; Well, President Clinton, Jim Guy Tucker. That's what they were-they weren't interested in talking about things other than that.

A: The networks were not interested in Jim Guy Tucker. They were interested in what Bill Clinton had to do with it.

Q: All right. And that's because Bill Clinton is the President of the United States, isn't it?

A: Yes, sir, that is.

Q: All right. And you had things to say on that subject?

A: I just told them what happened, but I limited it.

Q: But you did speak to them on that subject but not other subjects.

A: That's correct.

Q: All right. And you were carefully controlled?

A: My attorney advised me not to fully discuss even the subjects that I was questioned about, and his terms were you've got to save something for the wedding.

Q: All right. Mr. Hale, was it after your television statements concerning the president that you began to negotiate with an Independent Counsel over a plea of guilty?

A: It was several months later.

(Tr. 4079–4082)

Hale admitted to lying to the court during his guilty plea.

Q: And what you said to Judge Reasoner when you were pleading guilty was not true, was it?

A; Like I said when he asked me, I did not know I was going to have to say anything, and when you are standing up there, I was scared to death and I don't even recall what I said except it's recorded.

Q; Do you lie when you are scared?

A; No, but I was scared and I don't' remember what I said.

(Tr. 4097)

Tucker's counsel then inquired as to whether Independent Counsel apprised the court that Hale had not be truthful when Hale was sentenced.

Q: Did anybody bring up to Judge Reasoner at your sentencing that you made a false statement to the Court under oath at the time of your guilty plea?

A: I don't think that I made a false statement. If I did, it was a mistake. I did not intentionally falsely say anything.

Q: Mr. Hale, did anybody bring up what you had said to Judge Reasoner when you pleaded guilty at the time of your sentencing?

A: No, sir, they didn't

(Tr. 4101).

Tucker's counsel inquired about various attorneys who had represented Hale.

Q: Theodore Olson in Washington?

A: Yes, sir.

Q: Theodore Olson is a lawyer who commonly argues cases before the United States Supreme court, isn't that true?

A: I'm not-don't know. I know that he does that. I don't know that's what he commonly does.

Q: Well, commonly would be twice I think, but he does do that?

A: Yes, sir, he does.

Q: He is a former—

. [The Court overruled the government's relevancy objection]

Q: Mr. Hale, Mr. Olson is a Washington attorney?

A: Yes, sir.

Q: He's not admitted in Arkansas, is he, do you know?

A; I don't know.

Q: ;You don't know of him being admitted in Arkansas?

A: No, sir.

Q: Who pays Mr. Olson to represent you?

A: I do.

Q: And Mr. Olson represents you in what connection?

A: The only thing Mr. Olson represents me, I talked to Mr. Olson in December of 1993 when we got notified that they might subpoena me before Congress. They did not subpoena me before Congress. And then last year I got word again that they might subpoena me before Congress so I retained Mr. Olson simply, I do not know anything about how they do that up there, just to advise me on what do you do, where do you go, you know.

Q: And were you aware of his background when you hired him, of his fame, how well known he was?

A: When we went up there in December he was just a lawyer to me.

Q: Who referred you to Mr. Olson?

. . .

A: Randy Coleman found out there was a fellow down here who worked in Democratic Senator Hollingworth's office that knew him and recommended him.

(Tr. 4108–4110)

Later, Tucker's counsel asked Hale if he knew that Theodore Olson was a former partner of Kenneth Starr.[22] The government objected. The Court excused the jury to allow the parties to argue the matter. Tucker's counsel asked Hale whether he was aware when he employed Olson that he had been a former partner of the same law firm in which Starr was a partner. Hale replied that he did not know Kenneth Starr at the time. "Never heard of him."

(Tr. 4120). At that point, Tucker's counsel withdrew the question rendering the government's objection moot.

Under cross-examination by Susan McDougal's counsel, Hale admitted to covering up his fraudulent transactions (Tr. 4126–4128). Susan McDougal's attorney also questioned Hale about the benefits he received from the government. He read a stipulation by the government and defense that as of March 20, 1996, Hale had received $62,932.74 from the government over about a two year period (Tr. 4144). Hale admitted that he had committed several felonies (Tr. 4149) and that he was under investigation for insurance fraud in the State of Arkansas (Tr. 4150).

■ The Court finds that Tucker, and his co-defendants, had ample opportunity to cross-examine Hale, and that there was an abundance of evidence introduced which went to Hale's bias and his credibility. For example, Hale admitted to telling a lot of lies and concealing a lot of truths (e.g. Tr. 4154, 4286, 4308), lying to the FBI (e.g. Tr. 4249–4250; 4262), creating bogus transactions to defraud the SBA (e.g. Tr. 3721–3722; 3724–3725; 3740–3743; 3747) and lying, misleading and using friends and acquaintances for his own personal gain (e.g. Tr. 3751; 3757–3758; 3774–3775). Counsel for Tucker, as well as his co-defendants, referred in closing argument to the evidence concerning Hale's association with "Clinton haters."[23]

Even assuming the OIC withheld evidence that Hale received benefits from alleged "right wing" or anti-Clinton forces, that evidence, at the most, would be cumulative. The evidence at trial demonstrated that Hale pled poverty, yet managed to retain a high-powered Washington, D.C. attorney. The jury was certainly free to

---

**22.** Tr. 4117–4118

**23.** e.g. TR 7770–7771; 7791

infer that someone with a motive to assist Hale intervened on Hale's behalf. Given the other testimony regarding Hale's association with anti-Clinton forces in addition to his obvious attempt to "bring the President down," the jury certainly could conclude that those who wanted to help Hale also wanted to harm President Clinton and Tucker. *See United States v. Quintanilla,* 25 F.3d 694, 699 (8th Cir.1994) (no *Brady* violation where undisclosed evidence was merely cumulative).

■ Furthermore, even assuming Tucker's speculation that Olson was recruited by anti-Clinton forces to provide free legal assistance to Hale, that is not material. While Hale was an important witness, he was not the only one. In addition to numerous other witnesses, the government introduced numerous documents in support of its case. Review of the proceedings reveals that had additional evidence of any arrangements with Hale been disclosed it would not have changed the outcome of the proceedings. *See Dye v. Stender,* 208 F.3d 662, 664–65 (8th Cir.2000) (in light of the overwhelming circumstantial evidence of defendant's guilt, any additional evidence of witnesses' lack of credibility would have been immaterial).

Tucker contends that the jury's acquittal of Tucker of various counts is proof that the additional evidence would have been material. According to Tucker, the jury rejected the various counts against Tucker in which Hale's word was the only unfavorable evidence to Tucker. That the jurors split on the counts, however, indicates that they carefully considered the evidence before them, that they rejected those counts which relied on Hale's credibility, and convicted on those counts where there was other evidence of guilt. It is extremely unlikely, given the action of the jury, that any additional impeachment evidence would have changed the result in this case.

As the government states, "additional information could not have undermined [Hale's] credibility anymore than his concession that he was a felon who was willing to lie to escape punishment and for money, and that he had extensive contacts with President Clinton's and Tucker's political enemies." (Answer of the United States to Tucker's Petition, p. 22) [24]

The Court is not persuaded that Tucker has established that a reasonable probability exists that, had any additional evidence regarding Hale's association with political enemies of President Clinton and Tucker been disclosed, the result of the trial would have been different. Tucker's claim that the convictions must be vacated because the government violated the constitutional guarantees of *Brady v. Maryland* and its progeny is denied.

### Conflict of Interest

■ Tucker contends that his convictions must be vacated because of the actual and apparent conflicts of interest of Independent Counsel Kenneth Starr, who superintended Tucker's prosecution. Tucker points to the following as conflicts of interest:

The Arkansas Project–Olson–Starr: According to Tucker, Richard Mellon Scaife and Theodore Olson participated in the "Arkansas Project," which was described

---

**24.** At least one juror stated that the "jurors considered Hale 'an unmitigated liar [who] perjured himself.' " Another juror stated that he "didn't believe a thing Hale said." *Final Report of the Special Committee to Investigate Whitewater Development Corporation and Related Matters,* Senate Report 104–280 (filed on June 13, 1996), p. 584. Jurors also "indicated that the guilty verdicts they returned in the case were not at all based on Hale's testimony." *Id.* at 596. One juror stated that the jurors were able to use the other witnesses and did not need to use Hale's testimony. *Id.*

as an effort to gather damaging information about Bill Clinton and persons perceived to be associated with him. Olson and Starr were acquaintances, at the least, and former law partners.

The Starr–Scaife–Pepperdine Connection: Starr submitted a resignation, which he later rescinded, to assume position as Dean of the School of Public Policy at Pepperdine University, which is funded by Scaife.

The Paul Jones Case: According to Tucker, Starr had allied himself with persons representing Paula Corbin Jones in her lawsuit against President Clinton. Starr considered filing an amicus brief in *Jones v. Clinton,* which would argue that the President should not be immune from suit while he was in office.

Other associations with political adversaries: Tucker points to Starr's representation of the Republican National Committee ("RNC"), and the tobacco companies, which had been adverse to President Clinton and Tucker, as evidence of conflict.

Tucker relies on *Young v. United States ex rel. Vuitton et Fils, S. A.,* 481 U.S. 787, 790, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) in support of his assertion that the alleged conflicts require that his convictions be vacated. In *Young,* a plurality of the Court held that based on the Court's supervisory power, it was structural error for a court to appoint as prosecutor for a criminal contempt charge counsel for a party that was the beneficiary of the court order alleged to have been violated. The facts of this case in no way resemble those in *Young* such that *Young's* holding is applicable in this instance.

The Court does not write on a clean slate with regard to allegations of conflict of interest involving the Independent Counsel. Similar assertions have been ad-dressed in previous decisions regarding complaints made by Francis T. Mandanici, an attorney who resides in Connecticut.[25]

In *In re Starr,* 986 F.Supp. 1159 (E.D.Ark.1997), Judge Wright, writing for three of the judges of the Eastern District of Arkansas (including the undersigned) addressed two complaints lodged by Mandanici. In a March 11, 1997, letter-complaint ("Mandanici II") Mandanici raised two conflicts on Starr's part, the alleged conflict that Starr's law firm was involved in litigation with the RTC at the time Starr was investigating the RTC and the alleged conflict involving Starr's relationships with Scaife, his businesses, the Scaife Foundation and Pepperdine–University. In a letter-complaint dated June 19, 1997 ("Mandanici III") Mandanici alleged Starr violated rules prohibiting grand jury leaks and prejudicial public statements with regard to an article that appeared in the June 1, 1997, *New York Times Magazine.*

The court noted that allegations of conflict regarding the matters in Mandanici II had been reviewed by the Attorney General who determined that there was no basis for removal action by the Attorney General under 28 U.S.C. § 596(a)(1). 986 F.Supp. at 1161 (the Attorney General has determined that "RTC matter does not support the proposition that such a conflict substantially impairs Mr. Starr's current ability to carry out the duties of his office and that there is no evidence with respect to the Pepperdine University matter that would suggest Mr. Starr is unable to put aside his personal political views while carrying out his duties as Independent Counsel.")

Mandanici further alleged that Starr violated grand jury secrecy by commenting on Susan McDougal's refusal to testify be-

25. For a history of the various complaints filed by Mandanici, as well as actions by the Court, *see Mandanici v. Starr,* 99 F.Supp.2d 1019 (E.D.Ark.2000).

fore the grand jury and by commenting on possible ramifications concerning the disclosure of First Lady Hillary Rodham Clinton's notes of conversations with her lawyers. The court found no violations. Susan McDougal disclosed to the public the questions asked of her before the grand jury and the circumstances surrounding her refusal to answer the questions. The White House requested the release of Mrs. Clinton's notes of conversations with her attorneys. The court concluded that the allegations set forth in the complaints did not warrant further action and dismissed the letter complaints. 986 F.Supp. at 1163.[26]

Judge Eisele dissented with the portion of the opinion dismissing Mandanici II dealing with the alleged Pepperdine–Scaife–Starr conflict of interests. 986 F.Supp. at 1163. He believed that Starr "is laboring under the appearance of a serious conflict of interests stemming from the PepperdineScaife allegations," and believed that the court had a duty to investigate the matter to determine whether an

actual conflict exists. 986 F.Supp. at 1168.[27]

Mandanici appealed the court's refusal to refer his grievance for investigation and prosecution to the Eighth Circuit Court of Appeals. *Starr v. Mandanici,* 152 F.3d 741 (8th cir.1998).[28] The court found that Mandanici did not have standing to pursue his grievance in court beyond informing the court of the alleged misconduct and that he had no standing to appeal. 152 F.3d at 751.[29]

In a subsequent decision addressing additional grievances by Mandanici, Judge Nangle, appointed to hear the case after the judges of the Eastern District of Arkansas recused, found no basis to refer for investigation Mandanici's contention that Starr labored under a conflict of interest when he indicated in February 1997 that he was accepting an offer to become dean of the School of Public Policy at Pepperdine. *Mandanici v. Starr,* 99 F.Supp.2d 1019, 1032–1033 (E.D.Ark.2000) Mandanici conceded that there was no evidence that Scaife and Starr and ever met or that

26. Judge Wright noted that Mandicini was "obviously on a personal crusade to discredit" Starr.

21[T]his Court is unaware that Mr. Starr has ever acted in an improper or unethical manner in the matters over which this Court has presided, and in the absence of specific evidence of misconduct on the part of Mr. Starr in proceedings before this Court, and considering the motivation behind Mr. Mandanici's allegations, this Court declines the opportunity to provide Mr. Mandanici a forum for he pursuit of his "vendetta."
986 F.Supp. at 1162.

27. The alleged Pepperdine–Scaife conflict, according to Judge Eis-ele, "puts Mr. Starr's *personal, financial,* and *career* interests in possible conflict with his duty as independent counsel to exercise his prosecutorial power and discretion fairly and even-handedly. Would there be any incentive to exercise that power and discretion in a manner which might please Mr. Starr's past or future bene-

factor? That is the central question." 986 F.Supp. at 1167.

28. Mandanici also appealed the Orders of then Chief Judge Reasoner and Judge Wright denying Mandanici's motions to recuse themselves.

29. Judge McMillian, writing for himself, took "issue with the weight that the district court accorded to both the DOJ's letter and Mandanici's alleged personal or political animus in filing the..complaint, the district court's assumption that specific evidence of misconduct is required under [the disciplinary rules], and the district court's failure to analyze the substance of Mandanici's allegations." 152 F.3d at 746 n. 15. Agreeing with Judge Eisele, Judge McMillian opined that investigation of the alleged Pepperdine–Scaife conflict was warranted. Judge Loken responded that judicial investigation into an independent counsel whenever a citizens identifies an apparent political conflict of interest was not warranted. 152 F.3d at 755.

Scaife played any role in the selection of Starr for the deanship.

> Merely because Starr intended at the time to accept a deanship with a school that had conservative backers does not suggest that he was incapable of carrying out his duties as Independent Counsel without bowing to the political desires of contributors whom he had never met. To adopt Mandanici's argument would prevent an Independent Counsel from accepting any future employment in academia, because most schools are financially supported by either liberal or conservative contributors, or both.

99 F.Supp.2d at 1032–33.

Judge Nangle concluded that there was no evidence that "Starr's consideration of the deanship at Pepperdine or any potential future relationship with any other Scaife-funded conservative cause affected his performance as Independent Counsel or created an appearance of a conflict of interest." *Id.* at 1033–34.

With regard to Starr's representation of tobacco companies, Judge Nangle stated:

> Mandanici contends that Starr's representation was improper in light of the tobacco industry's alleged ties with the Republican party and the industry's "campaign to get Clinton." . . .
> The Court finds this allegation to be nonsense. There is no indication that Starr tailored his work as Independent Counsel in an attempt "to please the tobacco companies." Further, there is no evidence that the tobacco companies represented by Starr attempted to influ-

ence his investigation. Even assuming that the heads of the tobacco companies are totally Republican (an assumption which the Court finds absolutely ridiculous), they are entitled to hold their own political beliefs, as is an Independent Counsel (and as is one who brings grievances before this Court). The Court, however, rejects the inference, absent any specific evidence, that political beliefs caused the representatives of Brown & Williamson or Phillip Morris to attempt in any manner to influence Starr's investigation or that those political beliefs caused Starr to tailor his investigation "to please" an outside party. In this country, tobacco companies, like other persons or businesses, are entitled to legal representation. Likewise under the Independent Counsel law, Starr was entitled to practice law, representing private clients.

*Id.* at 1035–36.

In *Steele v. Starr*, 99 F.Supp.2d 1042 (E.D.Ark.2000), Julie Hiatt Steele asked the court " 'to appoint counsel or investigate whether Kenneth Starr and/or others in the employ of the [OIC] solicited or attempted to solicit false testimony from'Steele and others." Steele had testified in the 1999 trial of Susan McDougal on perjury and obstruction of justice charges of alleged attempts by the OIC to solicit false testimony. *United States v. McDougal*, 47 F.Supp.2d 1103 (E.D.Ark. 1999). Steele also asked the court to appoint counsel to investigate the matters raised in "Mandanici IV." [30]

---

**30.** In "Mandanici IV," Mandanici argued "that the Court should appoint counsel to investigate whether Starr and his staff committed prosecutorial misconduct 'by attempting to solicit false incriminating evidence against President Clinton,' as indicated by defense witnesses during the 1999 trial of Susan McDougal." Additionally, Mandanici argued that the resignation of Sam Dash as

Starr's ethical advisor suggested that Starr exceeded his duties under the Independent Counsel Act when he testified at the hearing on impeachment before the House Judiciary Committee. Finally, Mandanici asked the court to reconsider his grievance alleging Starr's violation of grand jury secrecy rules, as well as matters raised in previous letter-grievances. 99 F.Supp.2d at 1024–25.

A description of Steele's connection with the OIC, stemming from her involvement in the Paula Jones case is set forth in Judge Nangle's decision. Steele contended, *inter alia*, that Starr had a conflict of interest because he and his law firm had given legal advise to Jones in *Jones v. Clinton*. With regard to the assertion that Starr had a conflict of interest because prior to becoming Independent Counsel he considered filing an amicus brief in *Jones v. Clinton* which would contend that the President should not be immune from suit while in office, Judge Nangle stated:

> The Court does not believe that this activity resulted in a conflict of interest. Starr's work was on the purely constitutional question of whether a sitting president could be sued in a civil suit. Mr. Starr is a former federal circuit judge as well as a former Solicitor General of the United States. He has a noted reputation for knowledge in the area of constitutional law, and it certainly should come as no surprise that he might be consulted by one party or the other on an important constitutional issue such as this one. Additionally, when Starr was appointed Independent Counsel, he ceased work on the brief. *Id.* For those reasons, the Court rejects Steele's allegation that this work led Starr to choose a side, eventually leading him to seek an improper indictment against Steele for perjury.

99 F.Supp.2d at 1047.

Judge Nangle denied Hiatt's request for appointment of counsel to investigate her complaints.[31]

■ Starr's representation of the RNC does not present any conflict of interest in this case. That the prosecutor is not of the same political party as the defendant does not, without more, mean that the prosecutor cannot fulfill his or her duty of loyalty to the United States to disinterestedly prosecute an individual, no matter what the individual's politics. *See United States v. Tucker*, 152 F.3d at 754 n. 26 (Loken, J. concurring, joined by Beam, J.) ("Independent counsel before and after Mr. Starr have usually been chosen from the opposing political party").

The Court finds that Tucker has failed to establish that Starr had a political conflict or personal bias against Tucker such that he could not meet the requirement of being disinterested. Furthermore, the Court is not persuaded that Starr was laboring under either an apparent or actual conflict of interest such that Tucker was denied a fair trial. Therefore, the Court finds that Tucker's contention that his convictions should be vacated because of actual and apparent conflicts of interest of Independent Counsel Starr is without merit and it is denied.

### Motion for Discovery

Tucker has filed a motion to invoke the discovery process pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings. Rule 6(a) provides that "[a] party may invoke the processes of discovery under the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure ... if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Tucker seeks information regarding any benefits Hale received from various persons and organizations politically adverse to Tucker. Tucker questions the result of the Shaheen investigation, arguing that it was limited to whether a crime occurred., and that

---

**31.** *See also Smith v. Starr,* 99 F.Supp.2d 1037 (E.D.Ark.2000) wherein Judge Nangle denied the request of Stephen A. Smith that the court appoint counsel to investigate whether Starr

· and/or others in the OIC solicited or attempted to solicit false testimony from Smith and others as well as other matters set forth in Mandanici IV.

it did not fully investigate what benefits Hale received.

Tucker asks for access to grand jury material, seeks a broad range of documents and asks to depose more than forty individuals, including former federal employees who had some connection with the OIC, the FBI, and the IRS, as well as alleged political opponents of Tucker and Clinton. He seeks a copy of the Shaheen Report.

 In essence Tucker wants to replow the same old ground. He basically wants to redo the entire Shaheen investigation, somehow believing that he will be able to find something not found by Shaheen and his army of investigators and assistant prosecutors. The matters concerning Hale, and his links to right-wing forces have been thoroughly investigated by others and have been the subject of numerous articles and books. Nothing has yet surfaced to indicate that there is information about Hale which Tucker should have had and which would have changed the outcome of this trial, and it is unlikely that Tucker will be able to find anything new by engaging in a fishing expedition.

The Court is not persuaded that Tucker is entitled to access to the "Shaheen Report" and other investigative materials of the Department of Justice and the OIC. Even assuming that there was evidence that Hale was receiving financial benefits from persons opposed to President Clinton and Tucker, and the OIC had knowledge of this information, it would not in the least have changed the outcome of the trial.

**32.** Tucker has also requested that the Court disclose its reasons for recusal from the complaints of Mandinici, Smith, Steele and certain judges against Starr, and that those reasons be placed under seal. While the Court is not persuaded that it is required to set forth the reasons, the Court wants to dispel any illusion of improper motive or hidden agenda.

The Court finds that Tucker has failed to establish good cause to invoke the discovery processes and his request is denied. *See Strickler v. Greene,* 527 U.S. 263, 286, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review.")[32]

## CONCLUSION

In sum, the Court finds that Tucker has failed to establish a basis for vacating his sentence and his motion pursuant to 28 U.S.C. § 2255 is denied. All pending motions are denied as moot.

## *JUDGMENT*

Pursuant to the Memorandum Opinion and Order entered this date, the motion to vacate, set aside, or correct sentence is hereby denied.

The Court recused because issues raised in the complaints might implicate matters Tucker had raised in his case which was still pending before the Court.